No. 95-2026

United States of America,     *
                              *
        Plaintiff - Appellee, *
                              *  Appeal from the United States
    v.                        *  District Court for the Eastern
                              *  District of Missouri.
George A. Webster, Jr.,       *
                              *
        Defendant - Appellant.*


Submitted:  November 14, 1995

Filed:  May 30, 1996


Before McMILLIAN, FLOYD R. GIBSON, and LOKEN, Circuit Judges.


FLOYD R. GIBSON, Circuit Judge.

In a seven count indictment, the Government charged George A. Webster, Jr., with committing various narcotics and firearms offenses.  A jury convicted Webster on all counts, and he now appeals.  Though a recent Supreme Court opinion requires us to reverse Webster's conviction for violating 18 U.S.C. § 924(c)(1) (1994) by using or carrying a firearm "during and in relation to" a drug trafficking crime, we otherwise affirm.


I.    BACKGROUND


On September 28, 1993, Missouri officials arrested James Suggs as he was travelling to a location where he was scheduled to sell a half-ounce of crack cocaine to an undercover officer.  Suggs immediately began cooperating with police and informed them that appellant George Webster was his narcotics supplier.  At that time,

the officers arranged to observe a transaction between Webster and Suggs during which Suggs would pay Webster $550 for crack that the supplier had "fronted" him. Missouri Highway Patrol Trooper Paula Woodruff accompanied Suggs to the meeting; while she was not physically present in Webster's car when the exchange occurred, she was able to witness the two dealers conversing from another vehicle parked nearby. Further, she had "wired" Suggs with a hidden device that recorded the event. The tape, though partially inaudible due to a prevalent electronic hum that obscures the recording, indicated to Trooper Woodruff that the speakers were planning future drug deals. This belief was confirmed by Suggs's own account of the discussion.

On January 13, 1994, Missouri Highway Patrol Corporal Kevin Glaser monitored another drug transaction between Suggs and Webster. After searching Suggs and his residence to verify that both were free of drugs, Corporal Glaser concealed a video camera in the living room of Suggs's trailer home. In addition, the officer hid a miniature tape recorder on Suggs. Corporal Glaser then secluded himself within the bedroom of the house and waited for Webster's imminent appearance. When Webster arrived at the trailer, he and Suggs conducted a transaction in which Suggs purchased an approximate half-ounce of crack cocaine for $600. The recording devices memorialized the deal, but there were problems with both media. The separate audio recordings created by the instruments were, again, partially inaudible. Additionally, as the stationary video camera was unable to fully accommodate the movements of its ambulatory subjects, Webster and Suggs at some points ventured beyond the range of the camera's lens. The video does reveal, however, that the two men exchanged items across a kitchen counter, and Trooper Glaser later retrieved from the counter a substance that proved to be crack cocaine.

During this period of time when Webster was unknowingly transacting business with a confidential informant, he had other,

more overt, encounters with law enforcement authorities. Police officers in Carbondale, Illinois arrested Webster on January 25, 1994 as he exited a train from Chicago. The officers found that Webster was carrying a large amount of cocaine in a leather bag. In subsequent custodial interviews, Webster admitted his involvement in a narcotics distribution enterprise and informed investigators that he had purchased "for his protection" a firearm with a "banana clip." This admission corroborated statements made by Suggs, indicating that Webster had brandished a similar weapon to the informant and had stated that "if something go down, I [Webster] have some protection." Authorities, though, were unable to locate the gun during a search of the residence in which Webster said the weapon was stored. Nonetheless, while thereafter executing a federal search warrant at a different dwelling, officers discovered several individuals, including Webster, along with a banana clip like Webster had described. The officers also found within the house illegal drugs, drug paraphernalia, and paperwork in Webster's name. In a contemporaneous consensual search of Webster's parked vehicle, the officials found over 700 rounds of ammunition for the banana clip.

The Government returned a seven count indictment against Webster, charging him with: 1) one count of conspiracy to distribute cocaine base (count one); 2) two substantive counts of distributing cocaine base (counts two and three); 3) one count of using a firearm during the commission of a drug trafficking felony (count four); 4) one count of unlawful acquisition of a firearm by a convicted felon (count five); and 5) two counts of possession of a firearm by a felon (counts six and seven). At Webster's trial, Trooper Woodruff testified during cross-examination that her review of the recording she caused to be made clearly indicated to her "that Mr. Webster is talking to Mr. Suggs, and they are discussing future drug transactions." The prosecutor did not, however, play the tape of that conversation for the jury. In contrast, the prosecutor did play for the jury both the audio and video tapes of

the deal that took place at Suggs's trailer.

On the fourth and last day of trial, Webster relayed to the district judge that he wished to discharge his appointed counsel, Mr. Jeffrey Rosanswank.  The following colloquy, edited for relevance, then ensued:

THE COURT:  All right. Come up, Mr. Webster, to the podium. . . . Now, I am going to ask you some questions, and the questions that I am going to ask you involve your apparent request to discharge your attorney.  And, accordingly, I will not allow those questions and your answers to be used against you.  But do you desire to discharge your attorney?

THE DEFENDANT:  Yes, I do, your Honor.

THE COURT:  Now, we are in the middle of trial.  As a matter of fact, we are near the end of the trial.  If I allow you to discharge your present attorney, I am not going to continue the case, and I am not going to appoint another attorney for you.  Do you still want to discharge him under those circumstance[s]?

THE DEFENDANT:  Well, I have a right, if I discharge my attorney, I have a right --

THE COURT:  You do not have that right.  We are in the middle of trial.  This case is in jeopardy, so we must proceed. I will let you proceed, if you wish to proceed on your own, but I am not going to get another lawyer for you.  It's that simple.  I will do this:  If you want to represent yourself, I will allow you to do this for the remainder of the trial, but I am going to insist that Mr. Rosanswank sit with you in an advisory-attorney capacity. I am assuming you are not skilled in the law.  That's true, is it not?

THE DEFENDANT:  That's true.

THE COURT:  You have no legal training, do you?

THE DEFENDANT:  That's true.

THE COURT:  You would not have the slightest idea about how to consider the Court's instructions that we are going to give to the jury at the end of the case, do you?

THE DEFENDANT: No, I don't.

THE COURT: Now, under all of those circumstances, and knowing that you are not skilled, and that you do have a skilled attorney representing you at the present time, do you still want to discharge him?

THE DEFENDANT: Yes, I do, your Honor.

After the court undertook an assessment of Webster's capacity to knowingly and voluntarily waive his right to counsel, the dialogue continued:

THE COURT: You understand that we are still going to proceed in this matter, and you are going to have to represent yourself, with Mr. Rosanswank advising you?

THE DEFENDANT: Yes, I do.

THE COURT: And you want to proceed on that basis?

THE DEFENDANT: The question is, your Honor, I really don't, but --

THE COURT: Well, you want another lawyer, and I have already told you I am not going to stop this trial and get you another lawyer. But other than that, do you still want to proceed in the way that I have just suggested?

THE DEFENDANT: I don't want to proceed in that way. I say I don't want to proceed in that way.

THE COURT: Well, that's the only way I am going to let you. I am going to let you proceed in one of two ways: The first is[,] we will go along just as we have been. Mr. Rosanswank will continue to be your attorney. . . . Now, the second option is that Mr. Rosanswank be discharged, and that you represent yourself. But if we do that, I am going to insist that Mr. Rosanswank stay at your side in an advisory capacity. Now, which of the two ways do you wish to proceed? I am only going to let you go one of those two ways.

THE DEFENDANT: Well, I am discharging Mr. Rosanswank, and I know I can't represent myself, so -- I am just not going to do it both ways.

THE COURT: Well, you are going to do it one of the two ways. . . . [W]e do not allow a case to be disrupted

5

at the very end of it, at the whim of a defendant, because you do not like the way Mr. Rosanswank may be representing your interests, or whatever your motivation is, to seek to discharge him.  Now, do you wish to go ahead and represent yourself, with Mr. Rosanswank advising you, or do you wish to have him continue to serve as your attorney, or neither?  If it's neither, I will make the decision.

THE DEFENDANT:  It's neither.

THE COURT:  All right.  I am going to deny your request to discharge Mr. Rosanswank, and I am going to insist that he continue to represent you.

The court then inquired into the basis for Webster's discontent and allowed the defendant, without fear of incrimination, to make any statement for the record.  Webster disclosed that he wished to discharge his attorney because he thought that the transcripts for certain pretrial hearings were inaccurate and contained statements from individuals who had not testified at the proceedings.  After finding that the offered reasons had "nothing to do with the effectiveness of Mr. Rosanswank," the court reaffirmed its decision denying Webster's request to discharge his lawyer.

Later that day, the jury convicted Webster on all counts.  The district court sentenced Webster to two hundred ninety-five months imprisonment, which included a mandatory sixty month consecutive term for using or carrying a firearm during and in relation to a drug trafficking crime.  This appeal followed, and Webster now challenges his convictions[1] by arguing that:  1)  the district court violated his Sixth Amendment rights by improperly disposing of his request to discharge appointed counsel; 2) the district court committed error by admitting into evidence the audio and video recordings of narcotics transactions; and 3) the district court improperly instructed the jury on the law applicable to 18

---

[1]Webster initially raised an additional ground for relief claiming that the district court committed error in sentencing. He has since voluntarily withdrawn this argument.

U.S.C. § 924(c)(1) and, in any case, there was insufficient evidence to sustain his conviction for using or carrying a firearm during and in relation to a drug trafficking crime. In light of the Supreme Court's opinion in Bailey v. United States, 116 S. Ct. 501 (1995), we reverse Webster's conviction for violating 18 U.S.C. § 924(c)(1), but we affirm the district court in all other respects.

## II. DISCUSSION

### A. Webster's Attempt to Replace Counsel

In asserting that the district court incorrectly disposed of his request to discharge Mr. Rosanswank, Webster basically advances two discrete arguments. First, he claims that the district court wrongfully refused to replace his court appointed attorney. Also, Webster maintains that the court's action deprived him of his constitutional right to self-representation.

#### 1. Attorney Discharge

A motion to substitute court appointed counsel is committed to the district court's sound discretion. Hunter v. Delo, 62 F.3d 271, 274 (8th Cir. 1995). To prevail on the request, a criminal defendant must demonstrate "a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." United States v. Long Crow, 37 F.3d 1319, 1324 (8th Cir. 1994) (quotations omitted), cert. denied, 115 S. Ct. 1167 (1995). "Last-minute requests to substitute defense counsel are not favored." United States v. Klein, 13 F.3d 1182, 1185 (8th Cir.), cert. denied, 114 S. Ct. 2722 (1994).

In this case, the district court acted well within its wide discretion when it declined to provide substitute counsel.

7

Webster's extremely untimely request, which came on the last day of trial, did not even begin to meet the standards for replacement set forth in our previous cases.  Indeed, as the district court correctly observed, the alleged basis for Webster's complaints had absolutely nothing to do with Mr. Rosanswank's representation, but rather involved perceived inaccuracies in transcripts of pretrial proceedings.  Accordingly, we find that the district court correctly refused Webster's attempt to obtain substitute counsel.[2]

### 2.    The Right to Self-Representation

Webster alleges that the district court impinged upon his Sixth Amendment right to self-representation by offering him the "Hobson's choice" of continued representation by a lawyer in whom he had lost all trust or proceeding pro se with that same attorney serving as standby counsel.  Webster concedes that a trial judge may, over a pro se defendant's objections, permissibly appoint standby counsel to assist the defendant in an advisory capacity.  See McKaskle v. Wiggins, 465 U.S. 168, 184 (1984).  Still, he declares that the district judge in this case committed error by insisting that Mr. Rosanswank be Webster's standby counsel.  According to Webster, the district court could have cured the constitutionally offensive choice by displaying a willingness to appoint standby counsel other than Mr. Rosanswank.

---

[2]Webster additionally contends that the district court, before making its decision, did not adequately consider the grounds underlying his motion.  Of course, once an indigent defendant requests substitute counsel, "the court has a duty to inquire into the factual basis of the defendant's dissatisfaction." United States v. Blum, 65 F.3d 1436, 1441 (8th Cir. 1995), cert. denied, 116 S. Ct. 824 (1996).  Here, the district court granted Webster leave to freely explain the reason for his discontent.  Only after Webster had taken advantage of this opportunity did the court conclusively deny the request for replacement counsel.  We therefore conclude that the district court satisfactorily inquired into the basis of Webster's dissatisfaction.

We do not agree that the district court's actions violated Webster's Sixth Amendment rights. First of all, it does not appear to us that Webster successfully invoked his right to self-representation. A defendant who wishes to waive his right to counsel, and thereby to proceed pro se, must do so clearly and unequivocally. Hamilton v. Groose, 28 F.3d 859, 862-63 (8th Cir. 1994), cert. denied, 115 S. Ct. 741 (1995). To the extent that Webster at all tried to express a desire to represent himself, a review of the record suggests that attempt was anything but clear and unequivocal. While conversing with the district judge, Webster never explicitly indicated that he wanted to proceed pro se; to the contrary, at one point he stated that he knew he could not represent himself. It was the trial judge who initially proposed that Webster might proceed pro se as an alternative to continued representation by Mr. Rosanswank, and Webster's primary, if not exclusive, objective seems to have been the procurement of substitute counsel. Recognizing that the district judge must "indulge in every reasonable presumption against a defendant's waiver of his right to counsel," id. at 862 (quotation and alteration omitted), we would be extremely reluctant to find that Webster clearly and unequivocally expressed his desire to represent himself.

Even assuming that Webster did correctly invoke this constitutional prerogative, his claim still fails. Appointment of standby counsel is within the discretion of the district court, and a pro se defendant does not enjoy an absolute right to standby counsel. Locks v. Sumner, 703 F.2d 403, 407-08 (9th Cir.), cert. denied, 464 U.S. 933 (1983); see also United States v. Swinney, 970 F.2d 494, 498 (8th Cir.)("[T]he district court may properly require the defendant to choose either to proceed pro se, with or without the help of standby counsel, or to utilize the full assistance of counsel . . . ."), cert. denied, 506 U.S. 1011 (1992). It necessarily follows that a defendant does not have a right to standby counsel of his own choosing. See United States v. Mills,

895 F.2d 897, 904 (2d Cir.), cert. denied, 495 U.S. 951 (1990); United States v. Martin, 790 F.2d 1215, 1218 (5th Cir.), cert. denied, 479 U.S. 868 (1986). Where a district court has elected to appoint standby counsel, the defendant will be able to compel the attorney's dismissal only by meeting the criteria applicable to the discharge of a lawyer fully representing the accused. See Swinney, 970 F.2d at 498-99 (applying general discharge test to standby counsel situation).

As discussed previously, Webster woefully failed to establish reasons justifying substitution of his appointed counsel. Naturally, then, he was not entitled to demand a different attorney to serve in a standby capacity. It makes no difference that, in this case, the advisory attorney would have been the same lawyer in whom Webster reportedly had lost confidence. The options offered by the district court, characterized by Webster as a "Hobson's choice," represented a reasonable balance between a respect for Webster's asserted rights and an understandable desire to prevent disruption of an almost concluded criminal trial. See id. at 499 ("A defendant has no right to manipulate his right for the purpose of delaying and disrupting the trial.")(quotations omitted). In fact, other circuits have expressly approved a district court's decision to require the defendant to either continue with appointed counsel or proceed pro se with that same lawyer acting as a standby attorney. See, e.g., United States v. Mitchell, 788 F.2d 1232, 1236 (7th Cir. 1986)("[T]he trial court did not offer [the defendant) an impermissible choice by requiring him to proceed either pro se plus [unwanted] standby counsel or with an attorney he didn't like."). Webster made no allegation before the district court that Mr. Rosanswank had provided ineffective assistance, and he was thus faced with "a real alternative" between proceeding pro se or continuing with appointed counsel as his attorney. See United States v. Blum, 65 F.3d 1436, 1442 (8th Cir. 1995)(dismissing similar "Hobson's choice" argument where defendant had been offered "a real alternative"), cert. denied, 116 S. Ct.

824 (1996).  We find that the district court scrupulously honored Webster's Sixth Amendment rights.[3]

### B.    Admission of Tape Recordings

Webster complains that the district court wrongfully received into evidence the audio and video tapes produced by the Government.  The admission of tape recordings is "within the sound discretion of the trial court and will not be reversed unless there has been an abuse of that discretion."  United States v. Martinez, 951 F.2d 887, 888 (8th Cir. 1991)(quotations and alteration omitted), cert. denied, 503 U.S. 994 (1992).

As a preface to the introduction of a recording, the Government must make a prima facie showing of the tape's trustworthiness.  To decide if the Government has met its foundational burden, the district court uses as a general guideline the factors we enumerated in United States v. McMillan, 508 F.2d 101, 104 (8th Cir. 1974), cert. denied, 421 U.S. 916 (1975).  That case requires the prosecution to demonstrate:

> (1) the recording device was capable of recording the events offered in evidence; (2) the operator was competent to operate the device; (3) the recording is authentic and correct; (4) changes, additions, or deletions have not been made in the recording; (5) the recording has been preserved in a manner that is shown to the court; (6) the speakers on the tape are identified;

---

[3] In fact, the district court could have denied outright Webster's petition to represent himself.  "[T]he right to self-representation is unqualified only if demanded before trial. Once trial commences, that right is subject to the trial court's discretion which requires a balancing of the defendant's legitimate interests in representing himself and the potential disruption and possible delay of proceedings already in progress."  United States v. Wesley, 798 F.2d 1155, 1155-56 (8th Cir. 1986)(citation omitted).  Under the circumstances of this case, it would have been within the district court's discretion to altogether refuse Webster's request to proceed pro se for the few hours that remained in his trial.

and (7) the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

United States v. Roach, 28 F.3d 729, 733 (8th Cir. 1994). These criteria are a useful gauge for determining whether the tape's "substance and the circumstances under which it was obtained [provide] sufficient proof of its reliability." Id. at 733 n.4 (quotation omitted).

Even when the Government satisfactorily clears the McMillan hurdle, the defendant may still prevent admission of the tape by proving that it is inaccurate because of inaudibility or some other infirmity. United States v. Font-Ramirez, 944 F.2d 42, 47 (1st Cir. 1991), cert. denied, 502 U.S. 1065 (1992). A partially inaudible recording will be inadmissible where the defendant establishes that the unintelligible portions are "so substantial, in view of the purpose for which the tape[] [is] offered, as to render the recording as a whole untrustworthy . . . ." United States v. Huff, 959 F.2d 731, 737 (8th Cir.)(quotation omitted), cert. denied, 506 U.S. 855 (1992).

We conclude that the Government properly authenticated each of the three contested recordings under the McMillan factors. Webster maintains, however, that the two audio tapes are so inaudible that the district court should have prohibited their admission. He complains as well that the audio track of the video tape is hopelessly unintelligible; in addition, he claims that the video is inaccurate because the camera's lens was partially obscured and because the stationary recorder was unable to completely track its subjects' movements. We address these allegations seriatim.[4]

_____

[4]Webster also urges us to find that the district judge committed error by neglecting to assess the tapes in camera before they were played for the jury. We acknowledge that, where possible, it is good practice for the district court to make a pretrial evaluation of a recording's admissibility. See United States v. Nicholson, 815 F.2d 61, 62-63 (8th Cir. 1987). In this case, however, the defense waited until trial before it questioned the tapes' reliability. As observed by our colleagues on the First Circuit:

If [a pretrial assessment of admissibility] is not

12

### 1. The September 28, 1993 Audio Tape

We have listened to this tape and agree with Webster that a constant electronic hum severely hampers a listener's ability to discern the recorded conversation. The district court did admit this tape into evidence; significantly, however, the Government never played it for the jury. Rather, the prosecutors offered the cassette primarily because its mere existence tended to corroborate the testimony of certain witnesses. Because the jury could not have been adversely affected by something that it never heard, we cannot say that the district court abused its discretion when it allowed the Government to introduce this properly authenticated tape. Likewise, the district court did not commit plain error when it allowed Trooper Paula Woodruff, in response to defense queries, to testify concerning her evaluation of the contents of this tape.

### 2. The January 13, 1994 Audio Tape

Webster did not object at trial to the introduction of this microcassette, and the district court did not commit plain error by

---

possible, we see no reason why the district court must lengthen a trial by listening to the tapes outside the presence of the jury. Some tape recording playbacks run for a considerable period of time. If the recordings are properly authenticated, the trial judge can listen to them as they are played to the jury and rule on objections when made.

United States v. Carbone, 798 F.2d 21, 25 (1st Cir. 1986). We agree with this statement, and we thus decide that the district judge did not commit error when he failed to originally listen to the tapes outside the presence of the jury. See Nicholson, 815 F.2d at 63 ("We disagree with any suggestion, however, that a failure to [listen to tapes before trial] necessarily indicates an abuse of discretion.").

13

accepting it into evidence.  See Roach, 28 F.3d at 732 (applying plain error analysis where defendant had not objected to admission of tape).

### 3.   The January 13, 1994 Video Tape

We have little difficulty in deciding that the district court properly exercised its discretion by approving the admission into evidence of this video.  True, the camera's lens was partially obscured, and the recording did not preserve all of Suggs's and Webster's actions; furthermore, the tape's audio track is less than clear.  Nevertheless, these infirmities are not so pervasive as to render the tape as a whole untrustworthy.  The video still has significant probative value, for it shows Suggs and Webster conducting some sort of trade across a kitchen counter.  After this exchange, Webster can be seen holding in his hand what appears to be a wad of money.  Moreover, as noted above, Corporal Glaser later collected crack cocaine from the counter.  Given these facts, we think it was certainly within the district court's discretion to admit this videotape.[5]

### C.   Webster's Conviction Under 18 U.S.C. § 924(c)(1)

In his initial brief before this Court, Webster alleged that the Government presented insufficient evidence to sustain his conviction for using or carrying a firearm during and in relation to a drug trafficking crime.[6]  After we accepted the case as

---

[5]Also, contrary to Webster's assertions, the district court did not permit Corporal Glaser to comment inappropriately about what was portrayed on the video.

[6]This serves to distinguish the case at bar from United States v. McKinney, 79 F.3d 105, 108-09 (8th Cir. 1996), in which we deemed a Bailey challenge waived because, among other factors, the appellant "did not argue in his initial appeal brief that his conviction for using firearms was in any way infirm."

14

submitted, the Supreme Court in Bailey v. United States, 116 S. Ct. 501 (1995), explained that the word "use" as employed in 18 U.S.C. § 924(c)(1) has a narrower meaning than this Court had previously indicated. Compare id. at 505-09 with United States v. Matra, 841 F.2d 837, 841-43 (8th Cir. 1988). Consequently, we granted the parties' motions to allow supplemental briefing addressing the effect of Bailey on this appeal.

Webster raises two grounds in support of his argument that the recent Supreme Court opinion compels reversal of this firearm conviction. First, he asserts that the district court's jury instruction was erroneous. In addition, he continues to maintain that there was insufficient evidence to support his conviction under 18 U.S.C. § 924(c)(1). We reverse for instructional error.

In relevant portion, the district court charged the jury:

> [I]n order to sustain its burden of proof for the crime of using or carrying a firearm during and in relation to . . . a drug trafficking crime, as charged in Count 4 of the indictment, the Government must prove these following two essential elements beyond a reasonable doubt:
> And first:
> The defendant committed the crime of conspiracy to distribute cocaine base, and to possess cocaine base with the intent to distribute it, as charged in the indictment.
> And second:
> During and in relation to the commission of that crime, the defendant knowingly used or carried one or more firearms.
> Now, the phrase "uses or carries a firearm" means having a firearm or firearms available to assist or aid in the commission of the crime alleged in Count 1 of the indictment.
> In determining whether the defendant used or carried a firearm, again, you can consider all of the factors received in evidence in the case, including the nature of the underlying drug trafficking crime alleged; the proximity of the firearm in question; the usefulness of the firearm to the crime alleged; and the circumstances surrounding the presence of the firearm.
> Now, the Government is not required to show that the

15

defendant actually displayed or fired the weapon.

The Government is required, however, to prove beyond a reasonable doubt that the firearm was in the defendant's possession, or under the defendant's control, at the time that a drug trafficking crime was committed, or otherwise facilitated the commission of the offense, or at least had a role in the offense.

Because Webster did not object to this instruction as given, we may reverse only if the district court committed plain error. See United States v. Ryan, 41 F.3d 361, 366 (8th Cir. 1994)(en banc), cert. denied, 115 S. Ct. 1793 (1995).

In United States v. Olano, 507 U.S. 725 (1993), the Supreme Court elaborated upon the plain error analysis applicable in cases, like the one presently before us, governed by Federal Rule of Criminal Procedure 52(b). Before considering reversal under that Rule, we must first find that the district court committed an unwaived error. Id. at 732-34. Second, the error must be plain, that is, clear and obvious, under current law. Id. at 734. Third, the appellant must show that the error affected his substantial rights by prejudicially influencing the outcome of the district court proceedings.[7] Id. at 734-35. Where these prerequisites are met, a court of appeals may order correction of the mistake. Id. at 735. We will exercise this discretion in the appellant's favor where the error "'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" Id. at 736 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936))(alteration omitted).

Viewing the facts of this case in light of the Supreme Court's decision in Bailey v. United States, 116 S. Ct. 501 (1995), we find that the district court committed error. The judge informed the

---

[7]Though the Supreme Court recognized that in some situations errors might be presumed prejudicial or corrected despite their effect on the outcome, see Olano, 507 U.S. at 735, this is not such a "special" case.

16

jury that a defendant "uses or carries a firearm" whenever he has "a firearm or firearms available to assist or aid in the commission" of a drug trafficking offense. In evaluating whether Webster "used or carried" the weapon, the jury was told to consider, <u>inter alia</u>, "the proximity of the firearm in question" and "the circumstances surrounding the presence of the firearm." It seems to us that the cumulative effect of these and other statements allowed the jury to find that Webster criminally used or carried the weapon in question due to the "mere presence and ready availability of [the] firearm."[8] <u>United States v. Mejia</u>, 8 F.3d 3, 5 (8th Cir. 1993)(quotation omitted). Of course, a conviction based on this factual finding would have been entirely in accord with the previous law of this circuit, but it is inconsistent with the Supreme Court's admonition that "the inert presence of a firearm, without more, is not enough to trigger § 924(c)(1)." <u>Bailey</u>, 116 S. Ct. at 508; <u>see also</u> <u>United States v. Price</u>, 76 F.3d 526, 527-28, 530 (3d Cir. 1996)(finding that <u>Bailey</u> invalidated instruction very similar to the charge here, but concluding that the error in that case was harmless).

To determine whether the error is clear under current law, we must resolve a question expressly left unanswered in <u>Olano</u>. There, the Court declined to consider "the special case where the error was unclear at the time of trial but becomes clear on appeal

---

[8]The Government claims that the instruction adequately defined the term "carry," but we disagree. In fact, it appears that this Court's traditional definition of the term "use" was so expansive that it effectively swallowed the word "carry." Prior to <u>Bailey</u>, we had infrequent occasion to explicate on the meaning of "carry," and we have only recently held that a person carries a weapon for purposes of § 924(c)(1) when he bears "the firearm on or about his person." <u>United States v. White</u>, 81 F.3d 80, 83 (8th Cir. 1996). The district judge in this case, acting consistently with our previous caselaw, perpetuated the subordination of the term. His instruction defined "use" and "carry" collectively, and the charge did not refer to the words as having separate meanings. Therefore, we are unable to conclude that the court properly apprised the jury of the meaning of "carry."

17

because the applicable law has been clarified." Olano, 507 U.S. at 734. Following the lead of several of our sister circuits, we conclude that, in deciding whether an error is clear under current law, the proper focus is the law applicable on appeal rather than at trial. See United States v. Viola, 35 F.3d 37, 42 (2d Cir. 1994)("'[C]urrent law' as used in [plain error analysis] means the law current at the time of the appeal, not at trial."), cert. denied, 115 S. Ct. 1270 (1995); United States v. Retos, 25 F.3d 1220, 1230 (3d Cir. 1994)(assessing plain error under law applicable at time of appeal); United States v. Jones, 21 F.3d 165, 173 & n.10 (7th Cir. 1994)(same). But cf. United States v. Washington, 12 F.3d 1128, 1138-39 (D.C. Cir.)(deciding that plain error framework is inapplicable where the error was not obvious under current law at the time of trial, but analyzing claims under the "supervening decision" doctrine), cert. denied, 115 S. Ct. 98 (1994). As such, we find the district court's § 924(c)(1) instruction to be clearly erroneous under current law.

Furthermore, Webster has successfully demonstrated that the error affected his substantial rights. As Chief Judge Arnold counseled in his separate opinion in Ryan:

> Here, the instruction was erroneous with regard to an essential element of the crime. Had the jury been properly instructed in this case, it could have reached a different conclusion. Consequently, the judicial proceeding was compromised, and [the criminal defendant] was unavoidably prejudiced.

Ryan, 41 F.3d at 370 (Arnold, C.J., concurring and dissenting); cf. Viola, 35 F.3d at 42 (finding that where superseding opinion alters previously settled law, it is no longer necessary under the plain error analysis for the defendant to prove prejudice; instead, the Government must show that the error did not affect the defendant's substantial rights). We have already mentioned that the pertinent instruction in the case sub judice allowed the jury to convict Webster on this count even though it might not have found the

18

factual predicate required by <u>Bailey</u>.  Accordingly, we believe that Webster has satisfactorily established that the error "affected the outcome of the district court proceedings."[9]  <u>Olano</u>, 507 U.S. at 734.

Finally, because it is unclear whether a properly instructed jury would have found Webster guilty of violating § 924(c)(1), we feel that a failure to correct the district court's error could "result[] in a miscarriage of justice" and would "'seriously affect[] the fairness, integrity, or public reputation of judicial proceedings.'"  <u>Ryan</u>, 41 F.3d at 366 (quoting <u>Olano</u>, 113 S. Ct. at 736).  We therefore find it necessary to exercise our discretion under Rule 52(b) and reverse Webster's conviction for using or carrying a firearm during and in relation to a drug trafficking crime.[10]

## III.  CONCLUSION

We reverse Webster's conviction for using or carrying a firearm during and in relation to a drug trafficking crime and remand for a new trial on that count, but we affirm his convictions

---

[9]In reaching this conclusion, we reject the Government's contention that no rational jury could fail to find that Webster used or carried the weapon in question.  In our view, a properly instructed jury might reasonably have determined that the Government's proof did not establish a violation of § 924(c)(1). At the same time, though it is a close question, we hold that there was sufficient evidence to support Webster's conviction on this count.

[10]Because we reverse for trial error instead of evidentiary insufficiency, we remand for a new trial on this count. <u>See</u> <u>United States v. Schrader</u>, 10 F.3d 1345, 1352 (8th Cir. 1993)("As there was trial error but not insufficiency of the evidence, defendants may be retried.").  We note, though, that any subsequent prosecution for this offense must be consistent with the wording of the original indictment.  In other words, the Government must prove beyond a reasonable doubt that Webster used or carried the gun during and in relation to the drug conspiracy charged in count one of the indictment.

19

on the six remaining counts in the indictment.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.