# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3878/08-3800

_____

United States of America,      *

Appellee,      *

                         *   Appeals from the United States

v.                *   District Court for the

                         *   District of North Dakota.

Frederick W. Keiser, Jr.,      *

Appellant.      *

_____

Submitted: June 10, 2009
Filed: August 27, 2009

_____

Before SMITH and SHEPHERD, Circuit Judges, and LIMBAUGH, District Judge.[1]

_____

SMITH, Circuit Judge.

Frederick W. Keiser Jr. was convicted of 22 counts of wire fraud, money laundering, conspiracy to commit money laundering, and conspiracy to defraud the United States for conduct related to his promotion of two fraudulent "bank trading programs." The district court[2] sentenced Keiser to 144 months' imprisonment. On appeal, Keiser argues that the district court erred in (1) denying his motion to continue

_____

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota.

sentencing, (2) determining that he validly waived his right to counsel, (3) allowing the admission of expert testimony about the fiduciary duties of commodities brokers, and (4) applying certain sentencing enhancements. We reject Keiser's arguments and affirm the judgment of the district court.

I. *Background*

Keiser, a North Dakota farmer and licensed commodities broker, solicited investors for the Grenada corporation Preferred Trust and Management (PTM). In October 1999, Keiser purchased a lease company in PTM that enabled him to receive higher bonuses and commissions on the funds he solicited for PTM. PTM purported to operate a prime bank debenture trading program that provided investors the opportunity to participate with the world's leading banks in purchasing high-yield bank instruments at substantial discounts and selling them at higher prices. Keiser concedes that such programs are fictitious and that the funds solicited for PTM were used, in part, to pay high commissions to promoters. Keiser solicited more than $2 million from over 200 investors on behalf of PTM, but the majority of investors received nothing in return. In a one-year period from approximately January 2000 to January 2001, Keiser received nearly $950,000 in bonuses from PTM. The record indicates that the total loss associated with the PTM scheme exceeded $14.5 million.

Keiser concedes that he promoted the "bank trading program as a legitimate investment" although "[h]e had information by which he could have reasonably concluded the program was fictitious and had no factual or legal basis." In December 1999, Keiser downloaded a magazine article detailing the rise in prime bank schemes and stating that the Securities and Exchange Commission had warned that prime bank investments do not exist. He also downloaded a warning from the International Chamber of Commerce (ICC) concerning "inaccurate references to nonexistent ICC instruments," including bank debentures.

In December 2000, Keiser solicited an undercover investigator from the North Dakota Securities Commission (NDSC) to invest in PTM. Keiser explained to the investigator that the investment posed no risk and could garner a return as high as 300 percent. In January 2001, the NDSC issued a cease and desist order prohibiting Keiser from engaging in any scheme to defraud investors by offering for sale any PTM investments. In October 2001, Keiser entered into a civil settlement with the NDSC, agreeing to pay $500,000 to the NDSC Investor Restitution Fund and the North Dakota Securities Protection Fund.

In September 2001, Keiser and a group of potential investors met with Neville Solomon, the head of Mid-China Capital Management ("Mid-China"). At this meeting, Solomon described a number of investment opportunities available through Mid-China, including a bank trading program and a rock quarry. Keiser promoted Mid-China to investors, receiving at least $150,000 in return for his services. For example, in November 2002, Keiser and Solomon promoted Mid-China's bank trading program to Jeff Devine, assuring him that it was a safe investment. Devine ultimately invested $100,000 in the program. Keiser regularly emailed investors updates about the progress of Mid-China's bank trading program. Keiser concedes that he generated investments in Mid-China totaling approximately $500,000 and that none of the individuals who invested in Mid-China as a result of his solicitations received any return on their investments.

Keiser failed to file tax returns for the years 2000 to 2005. In 2003, Keiser informed an Internal Revenue Service agent that he had denounced his United States citizenship and was not required to file federal income tax returns.

On June 8, 2005, Keiser was charged with ten counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; three counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2; six counts of money laundering, in violation of 18 U.S.C. §§ 1957 and 2; two counts of conspiracy to commit money laundering, in

violation of 18 U.S.C. § 1956(h); and one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Keiser brought a motion to proceed pro se, which the district court granted upon finding that Keiser had voluntarily, intelligently, and knowingly waived his right to counsel.

The jury convicted Keiser of all charged counts on March 16, 2007, and the district court appointed a federal public defender to represent Keiser at sentencing. The court calculated a base offense level of 7 and a criminal history category of I. But the court calculated Keiser's total offense level as 39 based, in part, on its application of (1) an 18-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J) for causing loss in excess of $2.5 million; (2) a two-level enhancement pursuant to U.S.S.G. § 3B1.3 for using a special skill to facilitate the commission of the offense; and (3) a two-level enhancement pursuant to U.S.S.G. § 3B1.1(c) for serving as an organizer, leader, manager, or supervisor in the criminal activity. The court calculated Keiser's Guidelines range to be 262–327 months, but taking into account the 18 U.S.C. § 3553(a) factors, it sentenced Keiser to 144 months' imprisonment, followed by three years of supervised release, and ordered him to pay more than $2 million in restitution.

## II. *Discussion*
### A. *Denial of Continuance Motion*

Keiser first argues that the district court abused its discretion in denying his October 23, 2007 motion to continue sentencing. The district court originally scheduled sentencing for May 29, 2007, but successively rescheduled sentencing for June 11, 2007, August 10, 2007, and August 31, 2007. Following its appointment of the federal public defender to represent Keiser, the court again rescheduled sentencing for October 19, 2007. The public defender filed his notice of appearance on August 14, 2007, and moved for a continuance on September 5, 2007. The court granted the motion and rescheduled sentencing for November 2, 2007. On October 23, 2007, the

public defender filed another continuance motion, which the court denied on the following basis:

> [D]efense counsel has had adequate time to prepare for sentencing. Counsel was appointed for the defendant almost twelve weeks ago. The bulk of the transcripts will have been in counsel's possession for approximately one month at the time of sentencing. Defense counsel has been in possession of the discovery documentation for more than two months. It does not appear additional time is necessary for adequate preparation.

"We review a denial of a motion for continuance for abuse of discretion." *United States v. Vesey*, 330 F.3d 1070, 1071 (8th Cir. 2003). "District courts are afforded broad discretion when ruling on requests for continuances. Continuances generally are not favored and should be granted only when the party requesting one has shown a compelling reason." *United States v. Cotroneo*, 89 F.3d 510, 514 (8th Cir. 1996) (internal citation omitted). "In determining whether the district court abused its discretion by denying the motions for continuance, we consider 'whether counsel had sufficient time to prepare for trial; . . . whether counsel's conduct at trial showed that he was well prepared; [and] whether the court's refusal to grant a continuance prejudiced the defendant.'" *Vesey*, 330 F.3d at 1072 (quoting *United States v. Heine*, 920 F.2d 552, 555 (8th Cir. 1990) (per curiam)) (alterations in *Vesey*).

Keiser's attorney had sufficient time to prepare for sentencing, and his conduct demonstrated that he was well prepared. Keiser's attorney filed his notice of appearance on August 14, 2007, and the court sentenced Keiser on November 2, 2007, more than 11 weeks later. Keiser cites no authority supporting his argument that this time period was insufficient for his attorney to review the lengthy transcripts and voluminious discovery generated in the case. Indeed, Keiser's attorney filed a detailed sentencing memorandum on October 31, 2007, in which he objected to the application of various enhancements, argued for a downward departure based on Keiser's age and

physical condition pursuant to U.S.S.G. §§ 5H1.1 and 5H1.4, and argued for a § 3553(a) variance. Our review of the sentencing transcript likewise reflects that Keiser's attorney was well prepared and provided competent representation at Keiser's sentencing hearing.

Furthermore, Keiser identifies nothing in the record indicating that he was prejudiced by the district court's denial of his continuance motion. Keiser alleges that the court's denial of his continuance motion "prevented [his] counsel from obtaining the necessary command of the trial record" concerning "the determination of the amount of loss for purposes of U.S.S.G. § 2B1.1(b)," but he points to no evidence in the record indicating that the court's ruling affected his attorney's representation on that issue. In fact, Keiser's attorney persuaded the court to reject the 20-level § 2B1.1(b) enhancement requested by the government in favor of an 18-level § 2B1.1(b) enhancement.

Because Keiser's attorney had sufficient time to prepare for sentencing, the conduct of Keiser's attorney reflected adequate preparation, and Keiser fails to identify any evidence of prejudice, we hold that the district court did not abuse its discretion in denying Keiser's October 23, 2007 continuance motion.

B. *Waiver of Right to Counsel*

Keiser next argues that the district court erred in determining that he validly waived his right to counsel. We "review[] de novo a district court's decision to allow a defendant to proceed pro se." *United States v. Crawford*, 487 F.3d 1101, 1105 (8th Cir. 2007).

> The Sixth Amendment provides a criminal defendant the right to counsel and the corresponding right to waive the right to counsel and proceed pro se. If the defendant waives the right to counsel, the waiver must be voluntary, intelligent, and knowing. This standard is met if the trial court specifically informed the defendant of the dangers and

disadvantages of self-representation, or if the entire record evidences the defendant knew and understood the disadvantages.

*United States v. Armstrong*, 554 F.3d 1159, 1165 (8th Cir. 2009) (internal citations omitted); *see also Meyer v. Sargent*, 854 F.2d 1110, 1114 (8th Cir. 1988) ("It is . . . settled law that a criminal defendant has the right to waive his right to counsel at trial and to represent himself as long as the waiver is both voluntary, and intelligently and knowingly made."). "An on-the-record colloquy exploring the dangers of self-representation is recognized as the preferred method of substantiating a waiver's validity." *Crawford*, 487 F.3d at 1106.

At a status conference on September 28, 2006, Keiser's attorney informed the court that Keiser desired to terminate their attorney-client relationship. The court permitted Keiser's attorney to withdraw and ordered Keiser to find a new attorney by October 17, 2006. At the October 17, 2006 status conference, Keiser told the court that he was considering proceeding pro se. The court warned Keiser that it would be a mistake to do so, explaining the difficulties he would face both at trial and at sentencing. Keiser subsequently filed a motion to proceed pro se. At the November 30, 2006 status conference, Keiser demanded his right to proceed pro se, stating as follows:

> My understanding of the status conference was to determine that I do understand what I am waiving when I ask to represent myself, and what I am waiving is my right to assistance of counsel.
>
> I want to make it clear also that this court and the Court of Appeals in St. Louis recognize that I have absolute statutory right under Title 28, Section 1654, to go pro se even on appeal. And it isn't so much, your honor, that I have to be capable of representing myself, but I must be capable of understanding what it is that I am waiving, and I understand that perfectly, your honor.

The court then inquired whether Keiser desired to speak to a public defender about his case, to which Keiser replied, "Not at this point, but I couldn't close the door completely either, your honor." In attempting to persuade Keiser to reconsider proceeding pro se, the court explained, "And if you're here on your own, there won't be anyone that will be made available to you to provide you with that sort of assistance." Keiser stated that he understood that fact and did not wish to request the appointment of a public defender.

Keiser concedes that he "told the district court he did not want the court to appoint counsel to actually represent him." But he argues that a defendant who has exercised his right to proceed pro se has a Sixth Amendment right to the assistance of standby counsel and that his waiver of counsel was not voluntary, intelligent, and knowing because the court did not inform him of that right. According to Keiser, his statement that he would not "close the door" on consulting the public defender's office obligated the court to discuss with him the possibility of appointing standby counsel.

In support of his argument, Keiser relies solely on Justice Blackmun's dissent in *Faretta v. California*, in which Justice Blackmun observed that the holding in *Faretta* left open the question of whether "a defendant [who] has elected to exercise his right to proceed pro se" has "a constitutional right to assistance of standby counsel." 422 U.S. 806, 852 (1975) (Blackmun, J., dissenting). But Keiser points to no decision of the Supreme Court or this court recognizing a Sixth Amendment right to standby counsel.

We have rejected the notion that the Sixth Amendment guarantees a defendant an absolute right to standby counsel. In *United States v. Webster*, the defendant argued that the district court violated "his Sixth Amendment right to self-representation by offering him the 'Hobson's choice' of continued representation by a lawyer in whom he had lost all trust or proceeding *pro se* with that same attorney serving as standby counsel." 84 F.3d 1056, 1062 (8th Cir. 1996). We rejected the defendant's argument,

explaining that "[a]ppointment of standby counsel is within the discretion of the district court, and a *pro se* defendant does not enjoy an absolute right to standby counsel." *Id.* at 1063. We noted our previous statement that "'[t]he district court may properly require the defendant to choose either to proceed *pro se*, with or without the help of standby counsel, or to utilize the full assistance of counsel.'" *Id.* (quoting *United States v. Swinney*, 970 F.2d 494, 498 (8th Cir. 1992)). Under *Webster*, it was within the district court's discretion not to appoint standby counsel for Keiser.

Keiser invoked his right to proceed pro se over the district court's warnings, and he never requested that the district court appoint standby counsel. Because Keiser had no absolute right to standby counsel, we hold that the court's failure to inform him of such a right did not negate the validity of Keiser's waiver of his right to counsel.

## C. *Admission of Expert Testimony*

Keiser also argues that the district court abused its discretion in admitting expert testimony about the fiduciary duties of commodities brokers. "We review the district court's evidentiary rulings for abuse of discretion." *United States v. Urbina*, 431 F.3d 305, 311 (8th Cir. 2005).

At trial, the government called Lawrence Israel, a licensed broker with the National Futures Association, as an expert witness. Israel testified that he owns a company that is authorized by the Commodity Futures Trading Commission to provide the required ethical training to licensed commodities brokers and that Keiser completed such training provided by his company.

Israel testified that the training Keiser received would have addressed many topics, including just and equitable treatment of customers and disclosure obligations. For instance, Israel testified that a commodities broker is obligated to disclose conflicting information about an investment to an investor and is prohibited from

guaranteeing a rate of return on an investment. Israel made clear during his testimony that his background was in futures rather than securities.

Keiser first argues that Israel's testimony was irrelevant because it concerned the fiduciary duties of commodities brokers rather than securities brokers.[3] Keiser contends that the fiduciary duties of commodities brokers were "wholly irrelevant to any fact consequential to the determination of the securities fraud charges" he faced. But Israel's testimony was offered to demonstrate Keiser's knowledge and intent, not to demonstrate that he actually violated any specific fiduciary duties. Having received the ethical training provided by Israel's company, Keiser probably knew that bank trading programs are potentially fraudulent and that he was obligated to disclose information to investors about the risks incumbent in the investments he marketed. It is of no consequence that the ethical training concerned the fiduciary duties of commodities brokers rather than securities brokers.[4]

Keiser next argues that Israel's testimony was inadmissible under Federal Rule of Evidence 403, which provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Keiser contends that

[3]Federal Rule of Evidence 402 provides that irrelevant evidence is inadmissible, and Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[4]Keiser also argues that Israel's testimony was inadmissible under Federal Rule of Evidence 702, which provides for the admission of expert testimony if, inter alia, it is sufficiently reliable. Keiser contends that Israel's testimony was unreliable as to the field of securities trading, but as is explained above, Israel's testimony was relevant to demonstrate Keiser's knowledge and intent, not that he violated fiduciary duties of securities brokers.

the admission of Israel's testimony resulted in unfair prejudice because the testimony invited the jury "to make a decision on an improper basis—the duties owed by a commodities broker rather than a securities broker." Keiser also contends that the admission of Israel's testimony confused the issues and mislead the jury because the "testimony confused securities trading issues . . . with irrelevant commodities trading issues." But Israel clarified that his background was in futures, not securities, and his testimony was properly limited to the fiduciary duties of commodities brokers and the ethical training that his company provided concerning those duties.

In any event, "[w]e will reverse on the basis of an evidentiary ruling only when it 'affects the substantial rights of the defendant or when . . . the error has had more than a slight influence on the verdict.'" *United States v. White Horse*, 316 F.3d 769, 775–76 (8th Cir. 2003) (quoting *United States v. Ballew*, 40 F.3d 936, 941 (8th Cir. 1994)) (alteration in *White Horse*). Keiser argues that Israel's testimony prejudiced Keiser, but the only example of prejudice he identifies is the government's reference to the testimony in its closing argument. According to Keiser, the government mislead the jury by conflating commodities and securities practices. But our review of the record leads us to conclude that the government properly characterized Israel's testimony in closing argument as follows:

> [Keiser] knew what he's supposed to do when he's dealing with clients in the commodities world. Apparently he took the position that I'm not dealing with a commodity so I don't have to follow any of those rules and regulations. I can throw my ethics training out the window for this.
>
> Mr. Keiser had training, part of which was full disclosure to your clients, a balance between the good stuff and the bad stuff on the investment. He also had training with regard to whether or not, you know, this person is a seasoned, experienced investor or a newcomer to the business and how you should treat those people differently.

Contrary to Keiser's assertion, the government reminded the jury in its closing argument that Keiser's ethical training pertained to commodities and that his fraudulent activity did not involve commodities. Any unfair prejudice to Keiser would have been slight and insufficient to outweigh the probative value of Keiser being shown to have general knowledge of fiduciary responsibility principles in investing. In light of the overwhelming evidence of Keiser's guilt in this case, any error on the part of the district court in admitting Israel's testimony was harmless.

We hold, therefore, that the district court did not abuse its discretion in admitting Israel's testimony.

### D. *Application of Sentencing Enhancements*

Finally, Keiser argues that the district court erred in applying the §§ 2B1.1(b)(1)(J), 3B1.3, and 3B1.1(c) sentencing enhancements. "A failure to properly calculate the advisory Guidelines range is a significant procedural error, and [a] non-harmless error in calculating the guidelines range requires a remand for resentencing." *United States v. Spikes*, 543 F.3d 1021, 1023 (8th Cir. 2008) (internal quotations and citations omitted). "We review the district court's construction and application of the sentencing guidelines de novo, and we review its factual findings regarding enhancements for clear error." *United States v. Cordy*, 560 F.3d 808, 817 (8th Cir. 2009).

### 1. *Section 2B1.1(b)(1)(J): Amount of loss*

Keiser first challenges the district court's application of the 18-level § 2B1.1(b)(1)(J) enhancement for causing a loss of more than $2.5 million. The district court was required to make only "a reasonable estimate of the loss," and "the court's loss determination is entitled to appropriate deference" because of the court's "unique position to assess the evidence and estimate the loss based upon that evidence." U.S.S.G. § 2B1.1 n.3(C). For purposes of the § 2B1.1(b)(1) enhancement, "loss is the greater of actual loss or intended loss," *id.* § 2B1.1 n.3(A), and "actual

loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," *id.* § 2B1.1 n.3(A)(i).

Keiser concedes that the evidence established that he personally generated investments in PTM totaling approximately $2 million and investments in Mid-China totaling approximately $500,000, but he argues that "[t]his amount of investment activity . . . should not automatically be considered an amount of loss." Keiser admits that "[t]he majority of those investing in PTM with [him] received nothing in return" and that "no one who invested in Mid[-]China through [him] received . . . any return on their investment." These losses, along with the significant additional "reasonably foreseeable pecuniary harm" resulting from Keiser's actions, establish that the district court did not clearly err in finding that Keiser caused a loss of more than $2.5 million.

## 2. *Section 3B1.3: Use of a Special Skill*

Keiser next challenges the district court's application of the two-level § 3B1.3 enhancement, which applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." "'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.* § 3B1.3 n.4.

The district court applied the § 3B1.3 enhancement on the basis that Keiser used a special skill to facilitate the offense, emphasizing that Keiser was "a commodities broker holding himself out as an expert in the field of investments." "We give great deference to the district court's factual determinations regarding the use of a special skill and review those findings under the clearly erroneous standard." *United States v. Bush*, 252 F.3d 959, 962 (8th Cir. 2001) (internal quotation marks omitted).

Keiser argues that the district court erroneously applied the § 3B1.3 enhancement because there is no evidence that he used his commodities broker's license "in a manner that significantly facilitated the commission or concealment [of his] offense[s]." But we rejected a similar argument in *Bush*, in which the defendant, "a former investment counselor and manager at a major national brokerage firm," pleaded guilty to conspiring to commit securities fraud for selling unregistered promissory notes. *Id.* at 960–62. The defendant argued that the district court erred in applying the § 3B1.3 enhancement because "no special skill was required to sell unregistered promissory notes and that anyone, even an unskilled person, could have carried out the transactions involved." *Id.* at 962. We explained that "'[t]he legal question is not whether the task could be performed by a person without special skills, but whether the defendant's special skills aided him in performing the task.'" *Id.* (quoting *United States v. Covey*, 232 F.3d 641, 647 (8th Cir. 2000)). We emphasized that the district court found that the defendant's "extensive training and experience allowed him to draw victims into his fraud much more easily than someone without his skill" and that his "understanding of the intricacies of executing promissory notes and collateralizing them helped him establish a scheme that an otherwise unskilled person might have found more difficult to set up." *Id.*

Likewise, in this case, it is irrelevant that Keiser did not specifically use his commodities broker's license to commit the offenses. Like the defendant in *Bush*, Keiser's "training and experience" and "understanding of the intricacies" involved in the scheme facilitated his solicitation of victims and commission of the fraud. *See id.* Indeed, some of the investors solicited by Keiser were familiar with Keiser as a result of his work as a commodities broker. The district court did not clearly err in applying the § 3B1.3 enhancement.

### 3. *Section 3B1.1(c): Role in the Offense*

Finally, Keiser challenges the district court's application of the two-level § 3B1.1(c) enhancement, which applies "[i]f the defendant was an organizer, leader,

manager, or supervisor in [a] criminal activity." "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." *Id.* § 3B1.1 n.2. "The terms 'organizer,' 'leader,' 'manager,' and 'supervisor' are to be construed broadly." *United States v. McDonald*, 521 F.3d 975, 978 (8th Cir. 2008). "[T]o apply an adjustment under § 3B1.1, a court should consider, among other things, the defendant's decision-making authority, the nature of his participation in the crime, whether he recruited accomplices, the degree of his participation in organizing the offense and his control and authority over others." *United States v. Yerkes*, 345 F.3d 558, 563 (8th Cir. 2003). "We review for clear error the district court's factual findings underlying the imposition of a sentencing enhancement based on the defendant's role in the offense." *United States v. Rosas*, 486 F.3d 374, 376 (8th Cir. 2007).

Keiser argues that the district court erred in applying the § 3B1.1(c) enhancement because "[t]here is no evidence in this case [that he] had any supervisory responsibilities over anyone" or that "he organize[d], lead, or manage[d] anyone." But the record indicates that Keiser (1) asked Anthony Kautt, an individual Keiser solicited to invest in PTM, to exchange approximately $60,000 in large denominations for smaller bills; (2) gave group presentations promoting PTM; (3) arranged meetings between the head of Mid-China and potential investors; (4) emailed investors updates about the progress of Mid-China's bank trading program; and (5) moved to Las Vegas for a period of time to help establish Mid-China's office. In light of Keiser's substantial "organizing" activity within PTM and Mid-China, the district court did not clearly err in applying the § 3B1.1(c) enhancement.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____