# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1596

_____

United States of America,  *
                                               *

    Plaintiff - Appellee,  *

                                              *

    v.  *

                                              *

Eloy Vazquez-Garcia,  *

                                              *

    Defendant - Appellant.  *

_____

No. 02-1597

_____

Appeals from the United States
District Court for the Southern
District of Iowa.

United States of America,  *
                                               *

    Plaintiff - Appellee,  *

                                              *

    v.  *

                                              *

Juan Carlos Sosa-Alvarado,  *

                                              *

    Defendant - Appellant.  *

_____

Submitted:  October 8, 2002

Filed:  August 21, 2003

_____

Before MURPHY, JOHN R. GIBSON, and SMITH, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

Eloy Vazquez-Garcia and Juan Carlos Sosa-Alvarado appeal their convictions for conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846 (2000), and attempt to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) (2000) and § 846. Both defendants originally pleaded guilty to the conspiracy count, but later moved to withdraw their pleas. The district court[1] granted these motions, and the defendants were then jointly tried and convicted of both counts. On appeal, both argue that the evidence was insufficient to support these convictions. In addition, they argue that the district court erred in granting their separate motions to withdraw their guilty pleas and in denying their motions for a new trial based on newly discovered evidence. Sosa alone argues that he was deprived of his right to a fair trial by prejudicial comments made by the Assistant United States Attorney in closing argument.

I.

We state the facts in the light most favorable to the verdict. In March and April of 2000, Lori Rockey and Guy Hall made several trips between Des Moines, Iowa and the Santa Ana/Anaheim area in California, at the request of defendant Vazquez and Misty Rockey, Lori Rockey's daughter and Vazquez's girlfriend. Since Vazquez did not speak English well, Misty Rockey often served as Vazquez's translator and the primary contact in Iowa for Lori Rockey and Hall during each of these trips. On each of these trips, Lori Rockey and Hall would meet either defendant Sosa, an individual known as Chilongo, or both upon their arrival in California. At that time,

---

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

Sosa and/or Chilongo would take the car Lori Rockey and Hall used to drive to California and provide them with a different car for several hours. Sosa and/or Chilongo would later return the original car to Lori Rockey and Hall for the journey back to Iowa. Sosa also maintained a residence in Iowa, which he shared with Rubicela Petatan, his girlfriend, and an individual named Antonio Morales-Garcia.

On their final trip on April 22, 2000 to the Santa Ana/Anaheim area, Lori Rockey and Hall met Sosa, who took the white Chevrolet Lumina they had driven to California in exchange for a blue Lincoln Continental. Several hours later, Sosa returned the white Lumina to Hall and Lori Rockey for their drive back to Iowa. Soon after their departure, Lori Rockey and Hall were then stopped by officers of the California Highway Patrol. The officers found a small amount of marijuana in the ashtray of the Lumina and asked permission to search the car. Hall and Lori Rockey consented to a full search of the Lumina, in which the officers discovered fourteen pounds of methamphetamine and two pounds of cocaine.

Hall and Lori Rockey were arrested and agreed to assist the government in its investigation. The government flew Hall, Lori Rockey, and the Lumina back to Des Moines on a military plane. The police requested that Lori Rockey call Misty Rockey and ask her to retrieve the Lumina, and when Misty Rockey arrived to take the car, she was arrested. The police then asked Misty Rockey to call Vazquez and ask him to retrieve the Lumina, and they arrested Vazquez when he arrived. After having been read his Miranda rights in Spanish and signing a waiver, Vazquez agreed to speak with the police and gave a statement regarding his involvement in the transportation of drugs from California to Iowa. Vazquez then agreed to contact Antonio Morales-Garcia, who Vazquez said was his source of supply of drugs in California and was paying Vazquez to arrange for the delivery of these drugs to Iowa. Vazquez was not able to contact Morales, but Misty Rockey did reach him by phone and requested that he pick up the Lumina. Morales sent Petatan and Sosa, who had returned to Des Moines, to retrieve the Lumina. Sosa and Petatan drove to the

-3-

parking lot of a grocery store in Des Moines, where Misty Rockey met them with the Lumina. After Sosa and Petatan entered the car, they were arrested by law enforcement officials.

Sosa, Vazquez, Hall, Lori Rockey, Misty Rockey, Morales, Petatan, and a number of other individuals were all indicted for conspiracy to distribute methamphetamine, attempt to possess methamphetamine with intent to distribute, and other charges. Hall, Lori Rockey, and Petatan all pleaded guilty to these charges and agreed to testify against Sosa and Vazquez. Morales pleaded guilty to these charges on September 26, 2000. On February 16, 2001, he was sentenced to 180 months after receiving a downward departure for substantial assistance. The government eventually dropped all charges against Misty Rockey. Sosa and Vazquez initially pleaded guilty to these charges, but later were allowed to withdraw these pleas and proceed to trial. At trial, Sosa and Vazquez were convicted of conspiracy and attempt to possess methamphetamine and were sentenced to 292 months and 324 months, respectively.

II.

A.

Sosa and Vazquez both contend that the evidence presented at trial was insufficient to support their convictions for conspiracy to distribute methamphetamine. We review de novo the question of whether the evidence is sufficient to support a conviction. United States v. Campa-Fabela, 210 F.3d 837, 839 (8th Cir. 2000). In conducting this inquiry, we must view the evidence in the light most favorable to the verdict and accept all reasonable inferences that support the verdict. United States v. Shoffner, 71 F.3d 1429, 1433 (8th Cir. 1995). We may reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. Id. In order to support a conviction for conspiracy under 21 U.S.C.

§ 846, the government must show that (1) an agreement to distribute methamphetamine existed, (2) the defendant knew of this agreement, and (3) the defendant knowingly became part of the conspiracy. Shoffner, 71 F.3d at 1433.

At trial, the government presented sufficient evidence to show that a conspiracy existed involving the transportation of methamphetamine from southern California to Des Moines, Iowa. Hall and Lori Rockey described four very similar car trips between Des Moines and the Santa Ana/Anaheim area. On the first trip, Vazquez provided them with a powder blue Lincoln Continental with Iowa plates to retrieve Misty Rockey's impounded car. Lori Rockey testified that during the drive to California, she had to refill the gas tank more often than usual, prompting her to suspect that something was hidden in the gas tank. Upon arriving in California, they dropped the powder blue Lincoln at a bus station in Anaheim, obtained Misty Rockey's car and drove it back to Des Moines, whereupon they were paid by Vazquez and Misty Rockey.

Later that March, Vazquez and Misty Rockey asked Lori Rockey and Guy Hall to travel to California again and gave them money to rent a station wagon. On this trip, they followed two individuals known as Ruben Perez and Weto, who drove a maroon Lincoln Continental and were supposed to drop off this Lincoln in California and return with Lori Rockey and Hall. When Lori Rockey and Hall arrived in California, Sosa and Chilongo took the station wagon and gave them a blue Lincoln Continental in return, which had the same license plate as the powder blue Lincoln used in the first trip. Later that day, Chilongo and Sosa returned the station wagon to Lori Rockey and Hall, who drove Perez and Weto back to Des Moines. Lori Rockey and Hall were paid by Vazquez and Misty Rockey upon their return.

At the end of March, Hall and Lori Rockey again travelled to California at the request of Vazquez and Misty Rockey. This time, they drove a white Chevy Lumina obtained from Antonio Morales-Garcia, and were accompanied by Chilongo and

Perez. Upon arriving in California, Chilongo took the Lumina and gave them another blue Lincoln with the same Iowa license plate as the Lincolns used in the other trips. The next day, Chilongo and Sosa returned the white Lumina, and Sosa paid Hall $500. Lori Rockey, Hall, and Perez then returned to Iowa in the white Lumina and again, Lori Rockey and Hall were paid by Vazquez and Misty Rockey.

On the final trip, Lori Rockey and Hall traveled to California in the white Lumina. When they arrived in Santa Ana, Sosa met them at their motel and took the white Lumina in exchange for the same blue Lincoln as the last trip. Sosa also left Hall and Lori Rockey a cell phone so he could contact them while they were in California. Later, Hall and Lori Rockey left their motel and went to a parking lot in Anaheim, where Sosa and another individual returned the white Lumina and paid them $90.

Each trip involved Hall and Lori Rockey driving to California in a car provided to them in some way by Vazquez and the exchange of this car for one of several Lincoln Continentals. The original car would later be returned to them for the drive back to Iowa. On the final trip back to Iowa, law enforcement officials found methamphetamine and cocaine hidden in a secret compartment in the white Lumina. The jury could reasonably conclude from Lori Rockey's and Hall's testimony about the similar pattern of events in each trip, the use of the same set of vehicles for these trips, the fact that Lori Rockey and Hall were paid for making each trip, and the fact that drugs were found on the last trip that these trips were part of a plan to transport drugs from Southern California to Des Moines using Hall and Lori Rockey as couriers. The government may, after all, prove the existence of such a plan wholly by circumstantial evidence or by inference from the actions of the parties. Shoffner, 71 F.3d at 1433.

The government also supported this circumstantial evidence of a conspiracy with direct statements by co-conspirators. Lori Rockey testified that she had a

conversation with Perez, in which Perez told her that the reason Misty Rockey's car was impounded in California was because it was involved in the transportation of drugs. Petatan testified that while she was living with Morales she heard Morales mention that Sosa and Vazquez were involved in sending money to California and transporting drugs back to Iowa. Finally, Vazquez himself told DEA agent Lavastida that he had hired Hall and Lori Rockey as drug couriers and that Morales was his source of supply for the drugs obtained in California.

B.

Even if the evidence establishes the existence of a conspiracy, there must be some evidence of knowing, affirmative cooperation in furtherance of the conspiracy's unlawful aim in order for a defendant to be convicted of conspiracy. See United States v. Brown, 584 F.2d 252, 262 (8th Cir. 1978). The evidence of Sosa's role in coordinating the activities of Hall and Lori Rockey shows that he was not merely an acquaintance of the alleged members of the conspiracy who was present at the exchange or pick up of several cars. Hall and Lori Rockey both testified that on several occasions Sosa conducted the exchange of the cars in California himself or in association with other individuals. On the third and fourth trips, Sosa paid Hall and Lori Rockey, and for the fourth trip he provided Hall and Lori Rockey with a cellular phone to use to contact him. The evidence was also sufficient for the jury to reasonably conclude that Sosa knew that the exchanges of cars in California were for the purpose of transporting methamphetamine from California to Iowa. On the final trip, Sosa arrived by himself to take the white Lumina from Hall and Lori Rockey. Hours later, he returned this car and paid Hall and Lori Rockey. Shortly after Hall and Lori Rockey began driving back to Iowa, the car was stopped and found to contain fourteen pounds of methamphetamine and two pounds of cocaine. The fact that Sosa had control over the Lumina and coordinated the exchange of the Lumina shortly before this car was found to contain drugs is circumstantial evidence from which the jury could reasonably conclude that Sosa knew that the car contained drugs

for the return trip. This inference is strengthened by Petatan's testimony that she overheard Sosa and Morales discuss coordinating the purchase and transport of drugs from California and that she wired sums of money in the range of five to seven thousand dollars to Sosa in Santa Ana at the request of Morales.

Since the evidence was sufficient for the jury to reasonably infer that Sosa was aware that the Lumina contained fourteen pounds of methamphetamine, the evidence was also sufficient to support his conviction for attempt to possess methamphetamine with intent to distribute, since Sosa attempted to take possession of the Lumina after he had returned to Iowa. See United States v. Akers, 987 F.2d 507, 512 (8th Cir. 1993).

C.

Vazquez likewise argues that the evidence was insufficient to support his conviction for conspiracy to distribute and attempt to possess with the intent to distribute. Vazquez's task is more difficult, since in his post-arrest statement, testified to by Agent Lavastida, he admitted that he hired Hall, Lori Rockey, Ruben Perez, and Weto for the purpose of transporting methamphetamine from California to Iowa. Vazquez gave this statement after he received the Miranda warnings in Spanish and signed a waiver, and he neither argues that this waiver was invalid nor that Lavastida's testimony was inadmissible. Vazquez's statement was corroborated by the testimony of Hall and Lori Rockey that Vazquez requested their participation in the transport of methamphetamine from California and paid them for their efforts. Although Vazquez argues that their testimony shows that Hall and Lori Rockey worked primarily with Lori's daughter, Misty Rockey, Hall testified that Misty Rockey served as an intermediary between Hall and Lori Rockey, who did not speak Spanish, and Vazquez, who spoke little English. Furthermore, law enforcement officials retrieved from Vazquez's bedroom a heat sealer and a number of plastic bags, items which a government witness testified were commonly used in the packaging

and distribution of drugs. Officials also found five thousand dollars on Vazquez's person in cash packaged in a heat sealed plastic bag at the time of his arrest. This evidence is sufficient to support Vazquez's conviction for conspiracy to distribute methamphetamine. Since this evidence also allows a reasonable jury to conclude that Vazquez knew the Lumina transported back to Iowa contained methamphetamine, and Vazquez attempted to retrieve this car after he was contacted by Misty Rockey, the evidence is also sufficient to support Vazquez's conviction for attempt to possess methamphetamine with intent to distribute.

### III.

Sosa and Vazquez also challenge the district court's decision to grant their motions to withdraw their guilty pleas. On September 26, 2000, Sosa pleaded guilty to conspiracy to distribute methamphetamine under an agreement that recommended a 240-month sentence. On October 4, 2000, Vazquez also pleaded guilty to the same charge under an agreement that recommended a sentence of 168 months. Against the advice of their attorneys,[2] Sosa and Vazquez each filed a motion to withdraw his guilty plea and proceed to trial. The court granted both motions, finding that they had asserted a fair and just reason for withdrawal and had asserted their innocence, the government would not be prejudiced, and that the length of time between the pleas and the motions to withdraw was not excessive. See United States v. Prior, 107 F.3d 654, 657 (8th Cir. 1997) (setting forth factors to be considered in ruling on a motion to withdraw a guilty plea).

---

[2]At the time they pleaded guilty, both Sosa and Vazquez were represented by different attorneys than the ones who later represented them at their motions to withdraw their pleas and at trial. Vazquez filed a complaint about his attorney to the Iowa Supreme Court Board of Ethics, which prompted his attorney to withdraw from representation.

-9-

Now, after both defendants have been convicted and have received much longer sentences than provided for in their plea agreements, they argue that the district court should have refused to grant them the withdrawals they sought. Although we review the district court's disposition of a motion to withdraw a plea for abuse of discretion, United States v. Payton, 168 F.3d 1103, 1105 (8th Cir. 1999), Sosa and Vazquez cannot argue that the district court abused its discretion when it granted the plea withdrawals they requested. See United States v. Reyna-Segovia, 125 F.3d 645, 645-46 (8th Cir. 1997) (per curiam). In Reyna-Segovia, we held that a defendant who was permitted to withdraw his guilty plea "must accept the consequences of his request." Id. at 645-46; see also United States v. Mack, 258 F.3d 548, 556 (6th Cir. 2001) (denying on appeal the defendant's request to reverse the district court's decision to allow the defendant to withdraw his plea). Moreover, the record shows that the district court carefully considered each of the factors set forth in Prior, 107 F.3d at 657, and explained to the defendants that their decision was unwise given the evidence against them and that withdrawal of their pleas would most likely result in sentences much longer than they would have received under their plea agreements.

IV.

Sosa and Vazquez argue that the district court erred by denying their two motions under Fed. R. Crim. P. 33 for a new trial based on newly discovered evidence. The first motion, filed by Sosa on May 29, 2001 and joined by Vazquez on June 4, 2001, was based on an affidavit by Richard "Blue" Krehbiel, an inmate at the Newton Correctional Facility in Newton, Iowa at the same time as Vazquez, Sosa, and Guy Hall. According to Krehbiel, on February 22, 2001, Krehbiel overheard Hall tell Octavio Olivares that unless Hall received $6,000 from Sosa, Hall would testify against Sosa at trial and lie about Sosa's involvement in the methamphetamine conspiracy. The second motion, filed by Vazquez on November 29, 2001 and joined by Sosa on December 4, 2001, was based on an affidavit by Jose Luis Perez-Guerrero,

a fellow inmate of Hall's at the Polk County Jail in March of 2001. Perez-Guerrero composed this affidavit on October 16, 2001, while he was a fellow inmate with Sosa and Vazquez at Newton, in which he alleged that at Polk, Hall told him that unless Vazquez paid Hall $50,000, Hall would "make up a story that [Vazquez] was a drug dealer." The district court conducted a separate evidentiary hearing on each motion and heard testimony from Krehbiel and Perez-Guerrero, as well as Octavio Olivares and Sergio Olivares, who were also fellow inmates of Guy Hall at one time or another.

We review the decision of the district court to deny these motions for abuse of discretion. United States v. Johnson, 114 F.3d 808, 815 (8th Cir. 1997). In order to prevail on a motion for a new trial based on newly discovered evidence, the defendant must show that the evidence was not discovered until after trial, that the defendant's failure to discover this evidence before trial was not the result of a lack of diligence, that the new evidence is material, that it is more than merely cumulative or impeaching, and that it is likely to produce an acquittal if a new trial is granted. United States v. Dogskin, 265 F.3d 682, 685 (8th Cir. 2001).

We conclude that the district court did not abuse its discretion in denying the motion based on Krehbiel's affidavit. On February 24, 2001, two days after Krehbiel overheard Hall's conversation with Octavio Olivares, Krehbiel drafted a handwritten affidavit that purportedly summarized this conversation. Krebhiel claimed that he then gave the affidavit to a "tier tender," who delivered it to Vazquez, who then supposedly gave it to Sosa. Sosa testified at the evidentiary hearing that he received the affidavit from Vazquez on February 25, 2001 and that his cell mate translated it for him that day. Although Sosa was in possession of the affidavit well before his trial, and he admitted that his attorney had informed him that Hall would be a witness against him, he did not give this affidavit to his attorney until the first day of trial on

-11-

May 7, 2001, after the jury was empaneled.[3] Vazquez argues that he was not aware of the information in the affidavit until it was produced at trial. However, Krebhiel testified that he gave the affidavit directly to Vazquez, and Sosa claimed that he and Vazquez spoke on a regular basis and that he later showed the affidavit to Vazquez after it had been translated. Since a motion for a new trial on the grounds of newly discovered evidence cannot be granted on the basis of evidence that the defendant was aware of before trial, see United States v. Luna, 94 F.3d 1156, 1161 (8th Cir. 1996), the district court did not abuse its discretion in denying the motion.

We further conclude that the district court did not abuse its discretion in denying the motion based on the affidavit of Perez-Guerrero. The district court denied this motion on the grounds that the testimony of these witnesses was not credible and therefore a new trial would not likely result in an acquittal. Newly discovered evidence that is not credible is not likely to result in acquittal in a second trial, and therefore lack of credibility is sufficient grounds for denying a motion for a new trial. See United States v. Grey Bear, 116 F.3d 349, 350-51 (8th Cir. 1997). Perez-Guerrero, in his affidavit, claimed that Hall told him that Hall would testify falsely about Vazquez's involvement in the conspiracy unless he was paid $50,000. At the evidentiary hearing, Octavio Olivares stated that he had a conversation with Hall at the Newton facility in which Hall claimed he would refuse to testify against Sosa and Vazquez at trial as long as they paid him $6,000. Sergio Olivares, Octavio Olivares' brother, testified at the hearing that Perez-Guerrero told him between April and May of 2001 that Hall claimed that he had lied on the stand because he did not receive money from Vazquez or Sosa. The district court, who had the opportunity to observe the demeanor of the witnesses at the hearing, noted that Perez-Guerrero, Octavio Olivares, and Sergio Olivares each gave different accounts of what Hall said

---

[3]Before the direct examination of Hall by the government, Sosa's attorney questioned Hall about Krehbiel's statements in the affidavit outside the presence of the jury. Hall denied ever making the statements. The affidavit was received into evidence the day before Hall's testimony, but the jury never saw it.

regarding his alleged attempt to bribe Sosa and Vazquez which were substantially inconsistent not only with each other but also with the account of this conversation given previously by Krehbiel. Consequently, the district court did not abuse its discretion in finding the account of Hall's statements to be such that a second jury would not likely acquit Sosa and Vazquez.

V.

Sosa argues that he was deprived of his right to a fair trial by comments made by the prosecutor at closing argument. At closing argument, the prosecutor stated: "[The organization] has been broken up to a certain extent. The case is still active. I'm not at liberty to discuss anything that is still in the active status, but nine individuals were indicted at least in this bracket." Sosa's counsel objected to this statement on the grounds that it argued facts that were not in evidence. The district court sustained this objection and instructed the jury to disregard the comments about the ongoing investigation.

Sosa contends on appeal that by arguing facts not in evidence, the prosecutor provided the jury with an impermissible basis for a conviction and deprived him of his right to a fair trial. Prosecutorial comments in closing argument that argue facts not in evidence may constitute grounds for reversing a conviction. See, e.g., United States v. Beckman, 222 F.3d 512, 526 (8th Cir. 2000). However, we will only reverse a conviction on grounds of prosecutorial misconduct if the district court abused the broad discretion it has in controlling closing arguments. Id. Implicit in this standard is the principle that an appellate court may only review for error the actual decisions or actions taken by the district court. See Booker v. Special Sch. Dist. No. 1, 585 F.2d 347, 353 (8th Cir. 1978); Charter Oak Fire Ins. Co. v. Mann, 304 F.2d 166, 168 (8th Cir. 1962) (per curiam). In the context of a claim for prosecutorial misconduct, our standard of review does not allow us to conduct an independent inquiry into the propriety of the prosecutor's comment. Rather, Sosa's argument is limited to the

-13-

district court's exercise of discretion in response to the objection of Sosa's counsel to the comment.[4]  Here, the district court sustained the objection of Sosa's counsel to the prosecutor's comment, and the  record does not show that Sosa's counsel ever moved for a mistrial.  Therefore, Sosa cannot claim, and we cannot conclude, that the district court abused its discretion, since the court agreed with the grounds for the objection presented by Sosa's counsel and instructed the jury to disregard the comment.  If Sosa's counsel had moved for a mistrial on the basis of this comment despite the curative instruction, and if the district court denied this motion, we would then be able to examine whether the prosecutor's actions unduly prejudiced Sosa's right to a fair trial in accordance with the test set forth in Beckman, 222 F.3d at 526, and other cases.

## VI.

For the reasons stated above, we affirm the judgment of the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[4]Although we have often stated, most recently in United States v. Conrad, 320 F.3d 851, 855 (8th Cir. 2003), that "[o]n appeal, we review the facts of each case in order to determine if the prosecutor's remarks unduly prejudiced the defendant's opportunity for a fair trial" (citing United States v. Johnson, 968 F.2d 768, 770 (8th Cir. 1992), this review is nevertheless only appropriate in response to some action taken by the district court, for example, the overruling of an objection or the denial of a motion for a mistrial on grounds of prosecutorial misconduct.