# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 04-3956

_____

United States of America,             \*

                                        \*

           Appellee,            \*

                                          \*       Appeal from the United States

    v.                          \*       District Court for the

                                          \*       District of Minnesota.

Richard Ashton Oslund,          \*

                                        \*           [PUBLISHED]

           Appellant.          \*


_____

Submitted:  October 12, 2005
Filed:   July 14, 2006

_____

Before RILEY, HANSEN, and COLLOTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

Richard Ashton Oslund (Oslund) appeals his convictions for robbery affecting interstate commerce, murder with a firearm during a robbery affecting interstate commerce, and felon in possession of a firearm. See 18 U.S.C. §§ 922(g)(1); 924(c)(1)(A), (e)(1), (j)(1); 1951 (1998). After a two-week trial, Oslund was convicted by a jury for the robbery and murder of a Brinks security guard who was making a delivery and pickup at a Target store in Minnesota. After the verdict, the

district court[1] sentenced Oslund to two consecutive life terms, a concurrent twenty year term, and $278,745.00 in restitution. Oslund appeals his convictions and sentences on seven grounds. We affirm.

I.

William Strelow (Strelow) and Mike Frost (Frost), both employees of Brinks Security, traveled in an armored vehicle to the Target store in Bloomington, Minnesota, on November 22, 1998, to deliver and to retrieve money. Strelow was working as the messenger, the person who transferred the money to and from the vehicle. Frost was the driver and stayed in the vehicle while Strelow made the deliveries. Upon arriving at Target, Strelow loaded a dolly with several boxes of coins and entered the store. He transferred the coins to a store employee who then gave Strelow two bags, one containing checks and the other containing $59,750 in cash.

While Strelow was in the store, Frost monitored the area around the entrance. He noticed a man standing near the back of the truck, and as a cautionary measure notified Strelow of the man via two-way radio. Soon after, Strelow exited the store and went to the rear of the truck. At that time, the man who had been standing near the truck walked up to Strelow, shot him three times, grabbed the bag containing the cash, and ran. Strelow later died from his wounds.

The Bloomington Police Department and the FBI conducted a joint investigation into the murder and robbery. There were 39 witnesses who had been in the parking lot at the time the crime was committed. Three witnesses met with a sketch artist and three different drawings were produced, one of which was widely

---

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

distributed. Over 500 tips were received through a tip hotline. Numerous possible suspects were identified and investigated, and in early 1999, Oslund was identified as a suspect after the FBI received a tip from an attorney representing Zachary Koehler.

Koehler first met Oslund in 1992, and they later served time together in several Minnesota prisons and became good friends. Koehler was in Stillwater State Prison when the Target robbery occurred, and shortly thereafter, Oslund was also incarcerated at Stillwater for a parole violation. Koehler sought out Oslund and spoke to him briefly, noticing a new, large tattoo on Oslund's neck. He asked Oslund about it and Oslund replied that he "had to do it after the Target." (Trial Tr. at 471-72). Koehler knew about the Brinks robbery and to what Oslund was referring. He then asked Oslund what happened and Oslund replied that "things got out of control and I had to blast him." (Id. at 476). Koehler had recently received $1,000 from Oslund, and asked him if the money came from the Brinks robbery, to which Oslund replied that it had. After this conversation, Koehler called his attorney to pass the information along to the FBI.

The FBI taped two conversations between Oslund and Koehler, on June 16 and June 21, 1999, after arranging to have Koehler transferred to a different prison in which Oslund was then incarcerated. The June 21 conversation was admitted at trial, and it reveals that Oslund was suspicious about Koehler's transfer and Koehler's specific questions about certain crimes, including the robbery of an armored vehicle. While Oslund referred only to hypothetical situations, he did discuss how he would recommend committing such a robbery and his suggestions were practically identical to the details of the Target robbery.

Soon after these conversations, FBI Agent James Walden approached one of Oslund's close friends and former roommates, Thomas Russell, who agreed to cooperate in the investigation and tape conversations between Oslund and him.

Taping did not begin until August 28, 2000, though, due to difficulty in finding a time when neither Russell nor Oslund was in custody. Hundreds of hours of conversations between Russell and Oslund were recorded by the FBI between August 28, 2000, and March 17, 2001.

Oslund was reluctant at first to discuss the robbery but eventually began discussing the Target robbery after Russell told him he wanted to rob an armored car and was looking for some advice about how to do it. There were both inculpatory statements, some confessional in nature, and exculpatory statements on the tapes. Both the defense and the prosecution used excerpts from the tapes at trial.

On the two-year anniversary of the crime, the FBI installed video and audio recording equipment in a car and had Russell drive Oslund to the Bloomington Target store. Oslund and Russell again discussed the robbery and how Oslund had carried it out. Oslund also made inculpatory statements about the crime to others, who in turn testified to them at trial. Thomas Nelson testified that in 1999, Oslund described parts of the robbery and murder in several conversations between them, sometimes with others present. He added that Oslund even acted out how things had happened. Several other people who were with Oslund at various times also testified to his statements and admissions regarding the crime.

Two of the witnesses who were in the Target parking lot made positive identifications of Oslund. One, Melissa Downey, had made direct eye contact with Oslund for a short time before ducking behind a car when he pointed the gun at her. She met with Agent Walden on April 12, 2001, to view a multipicture photographic lineup. Ms. Downey identified Oslund's photograph as the person who had committed the crime, and she later identified him at trial.

The other witness who identified Oslund was Ryan McDonald, a teenager at the time of the robbery and murder. McDonald was walking towards the store and

saw a man standing by the rear of the armored truck. As he continued towards the store, he saw the man pull a gun. At this time, McDonald dove in front of the Brinks truck, heard three gunshots, and then heard a car pull out of the parking lot, tires squealing. McDonald met with Agent Walden on December 12, 2002, to review a multipicture photographic lineup. McDonald identified Oslund's photograph as the man he saw, and he also identified Oslund at trial.

Oslund offered an alibi, contending that he could not have committed the crime because he was at home and on the phone at the time. He used phone records to show that a collect call was placed from the Lino Lakes prison to the apartment where Oslund was then living at 2:59 p.m. on November 22, 1998. The call lasted fifteen minutes. David Heil, an inmate at Lino Lakes at that time who has a lengthy criminal record with more than ten prior felonies, testified that he had placed the call and spoke with Oslund. Heil even recalled the telephone conversation he had had with Oslund some six years prior. Upon cross-examination, Heil admitted that his memory of the conversation had been refreshed by a defense investigator prior to trial and that he was a good friend of Oslund's and would help him out if asked.

Oslund was indicted on May 5, 2003, and trial began on October 12, 2004. The case went to the jury on October 25, 2004, and a guilty verdict was returned the next day on all three counts. The district court sentenced Oslund to the statutory maximum of twenty years for the robbery (Count 1), life imprisonment on the murder conviction (Count 2), and life imprisonment for being a felon in possession of a firearm (Count 3). Oslund was also ordered to pay $278,745 in restitution. Oslund challenges his convictions and sentences on seven grounds: (1) the government failed to lay a proper foundation for the admission of the taped conversations between Russell and Oslund; (2) undue delay in the indictment caused prejudice to Oslund; (3) the government committed improper vouching; (4) the government improperly attacked the defense counsel during closing arguments; (5) the evidence was

insufficient to sustain the convictions; (6) the judge committed a <u>Booker</u>[2] error at sentencing; and (7) it was error for the court to order restitution for future lost wages.

## II.

### A. Improper Admission of Evidence

Oslund first challenges the admission of the taped conversations, alleging that no proper foundation for their admission had been made.  Specifically, he challenges the authenticity of the tapes and claims that the tapes were the result of unlawful inducement.  "The admission of tape recordings is 'within the sound discretion of the trial court and will not be reversed unless there has been an abuse of that discretion.'" <u>United States v. Webster</u>, 84 F.3d 1056, 1064 (8th Cir. 1996) (quoting <u>United States v. Martinez</u>, 951 F.2d 887, 888 (8th Cir. 1991) (internal marks omitted)).

Several nonexclusive factors should be considered when determining the admissibility of tape-recorded conversations.  <u>United States v. McMillan</u>, 508 F.2d 101, 104 (8th Cir. 1974), <u>cert.</u> <u>denied</u>, 421 U.S. 916 (1975).  They include

> (1) That the recording device was capable of taking the conversation now offered in evidence. (2) That the operator of the device was competent to operate the device. (3) That the recording is authentic and correct. (4) That changes, additions or deletions have not been made in the recording. (5) That the recording has been preserved in a manner that is shown to the court. (6) That the speakers are identified.  (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

<u>Id.</u>

---

[2]<u>United States v. Booker</u>, 543 U.S. 220 (2005).

These factors are useful to determine if a "tape's 'substance and the circumstances under which it was obtained [provide] sufficient proof of its reliability.'" Webster, 84 F.3d at 1064 (quoting United States v. Roach, 28 F.3d 729, 733 n.4 (8th Cir. 1994)). "These requirements do not, however, exist *in vacuo*; they become meaningful only when viewed in light of the facts of a specific case." Durns v. United States, 562 F.2d 542, 547 (8th Cir.), cert. denied, 434 U.S. 959 (1977). Not only do we look to the specific facts of a case, but it is worth noting that the technology related to recording devices has greatly advanced since McMillan was decided, a fact that supports the premise that the McMillan factors are guidelines to be viewed in light of specific circumstances, not a rigid set of tests to be satisfied. See Webster, 84 F.3d at 1064 (the McMillan factors are general guidelines for a district court to use in evaluating if the Government has met its burden); see also United States v. Clark, 986 F.2d 65, 68 (4th Cir. 1993) (government not required to meet every McMillan factor; the "factors, while helpful, merely 'provide guidance to the district court when called upon to make rulings on authentication issues.'") (quoting United States v. Branch, 970 F.2d 1368, 1372 (4th Cir. 1992)). In this light, we turn to the district court's admission of the tapes.

Oslund made a pretrial motion to suppress the tapes. After a hearing that included testimony from Russell, Agent Walden, and a St. Paul police officer, the district court denied Oslund's motion. Russell had been called by the defense to testify and was in custody at the time of the pretrial hearing before the magistrate judge. Oslund then challenged the admissibility of the tapes at trial on different grounds, claiming they lacked proper foundation. The district court initially sustained the objection and invited briefing on the matter. After further briefing and testimony, the court reversed itself, held that the tapes were admissible, and that the foundational elements of McMillan were satisfied. The government chose not to call Russell to testify at trial, as he was in custody in Wisconsin at the time, and instead made its case for admission through the testimony of Agent Walden.

Oslund contends that because Russell did not testify at trial, the government failed to properly authenticate the tapes and that Agent Walden's testimony was not sufficient to do so. While it may have been better for Russell to have testified about the recordings at trial, the district court did not abuse its discretion in holding that the government met its burden under McMillan. See United States v. Buchanan, 985 F.2d 1372, 1378-79 (8th Cir. 1993) (finding tapes admissible between defendant and informant even though informant did not testify at trial; McMillan factors were satisfied through testimony of officer), cert. denied, 512 U.S. 1228 (1994). Agent Walden testified that Russell would contact him prior to meeting with Oslund, that he would then provide Russell with a digital recorder, that Agent Walden would turn the recorder on and then turn it off after receiving it back, and that it was not possible for Russell to turn the recorder off. In addition, Agent Walden was able to identify each speaker in the recordings and thus authenticate the identity of the participants. See United States v. Frazier, 280 F.3d 835, 849 (8th Cir.) (testimony of federal drug agent that he was familiar with voices through work on wiretap provided sufficient foundation to identify participants in recorded conversation), cert. denied, 535 U.S. 1107, 536 U.S. 931, & 537 U.S. 911 (2002); United States v. Cerone, 830 F.2d 938, 949 (8th Cir. 1987) ("Any person may identify a speaker's voice if he has heard the voice at any time."), cert. denied, 486 U.S. 1006 (1988).

Oslund also contends that Russell's testimony is required to explain the existence of various "gaps" in the recordings. The "gaps" are periods of the recordings when no voices or conversation can be heard, as when the recording occurred in a bar and ambient or background noise is all that is discernable at times. Oslund argues that these "gaps" could show alterations or modifications or reflect times when Russell had moved the recorder to a location to avoid memorializing exculpatory statements by Oslund that could cause an inaccurate perception of the recorded conversation. However, this court has held that gaps in an audiotape affect "the weight of the evidence, not its admissibility." United States v. Byrne, 83 F.3d 984, 990 (8th Cir. 1996). See also United States v. Ray, 250 F.3d 596, 602 (8th Cir.

2001) (gaps in tape recording were not so substantial as to render entire recording untrustworthy and defendant could argue to jury that he was entrapped by informant into making incriminating statements), cert. denied, 535 U.S. 980 (2002); cf. Webster, 84 F.3d at 1065 (finding court did not abuse its discretion in admitting videotape where lens was partially obscured and did not cover all of the actions of those being recorded and the audio was partially unclear because the "infirmities are not so pervasive as to render the tape as a whole untrustworthy"). The "gaps" themselves, whether or not Russell testified at the trial, are not enough to render the recordings inadmissible and instead go to the weight a jury should assign the recordings.

Oslund also argues that the seventh element of McMillan was not met for two reasons: (1) that he was induced to speak to Russell and (2) that Russell was induced to cooperate with the government and to orchestrate the conversations because he wanted to collect part of the $115,000 reward money offered in this case. According to Oslund, this potential for a financial reward induced Russell to manipulate the conversations in order to get certain statements from Oslund. Oslund argues that because Agent Walden was not simultaneously monitoring the conversations as they occurred, and because Agent Walden cannot speak as to Russell's state of mind, that only Russell's testimony would satisfy this McMillan factor. We respectfully disagree.

In United States v. Brown, we held that the seventh factor in McMillan referred to the statements of the defendant in a recorded conversation, and as such, the defendant's statement must be made in good faith, without inducement, and voluntarily. 604 F.2d 557, 560 (8th Cir. 1979). We are presented with no evidence that Oslund did not voluntarily enter into these conversations with Russell or that he was somehow induced to do so, and as such, this argument fails. Id.; see also United States v. Riskin, 788 F.2d 1361, 1370 (8th Cir.) (no inducement when defendant voluntarily enters into conversation with informant), cert. denied, 479 U.S. 923 (1986).

Oslund alleges that Russell was induced into participating in the conversations and in choosing particular topics of discussion. This argument attacks the voluntariness of Russell's consent to participating in the recordings. Oslund argues that Russell, described as a lifelong criminal, agreed to participate for his own gain, whether that be the potential of reward money or the hope that he would receive assistance from law enforcement on future or pending criminal charges. Russell signed many consent forms throughout the time the tapes were made, and both he and various law enforcement officers testified that Russell was not promised leniency for his cooperation and was warned against committing other crimes while working with them because the government would not offer him assistance. "An individual's decision to allow the police to record a . . . conversation . . . is not necessarily involuntary just because the individual's motives were self-seeking, or because he harbored expectations of personal benefit." United States v. Kelly, 708 F.2d 121, 125 (3d Cir.), cert. denied, 464 U.S. 916 (1983). See also United States v. Janis, 831 F.2d 773, 775, 779 (8th Cir. 1987) (district court did not abuse its discretion by admitting tape recording of drug transaction that was made by paid informant), cert. denied, 484 U.S. 1073 (1988); United States v. Wallace, 597 F.2d 641, 642 (8th Cir.) (per curiam) (conversation was voluntarily recorded even though informant did so after promise that his assistance would be made known to prosecutor handling pending felony charge), cert. denied, 444 U.S. 856 (1979); United States v. Rich, 518 F.2d 980, 985 (8th Cir. 1975) (informant voluntarily gave consent to recording even though he did so in exchange for promise of immunity), cert. denied, 427 U.S. 907 (1976); McMillan, 508 F.2d at 104 n.2 (after considering totality of circumstances, it was clear that consent was given by informant, even though she was a paid government informant). This court addressed generally the issue of informant inducement in Buchanan, but while the court referred to the seventh McMillan factor, it did so by

considering the informant's consent to the recording.[3] Based on the record before us, we do not find any improper inducement.

Even if we were to find that there was not a total lack of inducement in the creation of the taped conversations, that would not automatically render the tapes inadmissible. The <u>McMillan</u> factors are a guide for the court to use, and if the totality of the circumstances surrounding the recordings satisfies the court as to their reliability, even if not every factor is explicitly and completely met, admission is proper. <u>See</u> <u>Webster</u>, 84 F.3d at 1064. Looking at the totality of the circumstances here, we conclude that the district court did not abuse its discretion in allowing the admission of the taped conversations between Oslund and Russell.

## B.  Preindictment Delay

Oslund next argues that the preindictment delay of five years was prejudicial to his case and caused a key piece of evidence to be destroyed that would have supported his alibi. Oslund's alibi throughout the trial was that at the time of the crime, he was on the phone with David Heil, an inmate at the Lino Lakes prison. Phone records supported the alibi in that they confirmed that a call was placed between the prison and Oslund's residence that lasted fifteen minutes and occurred during the time of the robbery. Heil testified that he placed the call himself and talked with Oslund, thus providing corroborating testimony for Oslund's alibi. However, to whom Heil talked that day could not be verified because even though

---

[3]In <u>Buchanan,</u> the appellant argued that the government failed to produce evidence satisfying the seventh <u>McMillan</u> factor. The government offered proof through law enforcement agent testimony that the informant had consented to the recordings. The court held that this was enough to satisfy the seventh factor and that while the appellant argued that the informant had been induced, "he fail[ed] to produce any evidence whatsoever to that effect or to refute the evidence presented by the government." <u>Buchanan</u>, 985 F.2d at 1379.

inmate phone calls are recorded, Lino Lakes retains the tapes only for two years. By the time Oslund was indicted in May 2003, the tape of the phone call from November 22, 1998, had been erased. Oslund claims that this almost five year delay prejudiced him by preventing his access to this tape, which he contends would have exonerated him.

In order to succeed on this claim, Oslund must show that the government deliberately delayed his indictment in order to gain some kind of advantage and that this delay caused him actual prejudice in presenting his case. United States v. Grap, 368 F.3d 824, 829 (8th Cir. 2004). However, Oslund raises this issue for the first time on appeal. We have held that "it is reasonable to interpret 'defects in indictments' as including delays in bringing indictments," and as such, any such motion claiming a defect in the indictment must be brought prior to trial. United States v. Farmer, 312 F.3d 933, 936 (8th Cir. 2002); see also Fed. R. Crim. P. 12(b)(3) (requiring that "a motion alleging a defect in the indictment" be brought prior to the start of trial). Because Oslund did not bring this motion prior to trial, the remedy he seeks is barred, and even plain error analysis on appeal can provide no relief. United States v. Gamboa, 439 F.3d 796, 804 (8th Cir. 2006).

### C. Improper Vouching

Oslund contends that the government committed improper vouching during its redirect examination of Koehler, when in response to a question about Oslund's statements about the Target robbery, Koehler stated, "I don't believe he made it up."[4]

---

[4]Oslund complains about the following line of questioning to Koehler. On cross-examination by the defense:
Q. Richard Oslund is a bragger, isn't he?
A. Yes.
Q. He wants everybody to know what a dangerous guy he is; right?
A. That's true.

(Trial Tr. at 530). Vouching occurs "when the government: (1) refers to facts outside the record or implies that the veracity of a witness is supported by outside facts that are unavailable to the jury; (2) implies a guarantee of truthfulness; or (3) expresses a personal opinion about the credibility of a witness." United States v. Benitez-Meraz, 161 F.3d 1163, 1167 (8th Cir. 1998). Oslund's reliance on government vouching appears misplaced in this context, as the government did not make any statements regarding or implying the truthfulness of its witness, Koehler. Instead, the objection Oslund makes is more akin to improper lay witness opinion testimony, and Oslund's brief in fact cites to several cases involving this alternative argument.

---

Q. And when he first told you that he had done the Target job, you didn't know if he was telling the truth or not; right?

A. That's true.

Q. In fact, given Richard Oslund's reputation, you knew it was possible he was just making it up; right?

A. No, I never thought that.

(Trial Tr. at 493-94).

On redirect examination by the prosecution:

Q. And based on your experience, could you characterize his bragging?

A. He, he just, he likes to, umm, talk about things that he's done to make himself, umm, I don't know, just to make people look up to him kinda. But he very often brags about things that he's done, things that he's gotten away with.

Q. And so based on your experience, it is things that he's actually done?

A. Yes.

Q. And I think Mr. Richman asked you whether it's possible he made that up, about the, ah, the Target armored car; do you recall that?

A. Yes.

Q. Based on the context of the conversation at the time, what was your belief as to whether or not he had made it up?

A. I don't believe he made it up.

(Id. at 530).

-13-

The statement at issue here is not one made by government counsel, but one by a witness regarding his opinion of statements made by Oslund. Rule 701 of the Federal Rules of Evidence states that if the witness testifying is not doing so as an expert, then any testimony expressing the witness's opinion or inferences is limited to those that "are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' [sic] testimony or the determination of a fact in issue." Fed. R. Evid. 701 (1998). "Personal knowledge or perceptions based on experience is a sufficient foundation for such testimony." In re Air Crash At Little Rock Ark., 291 F.3d 503, 515 (8th Cir.), cert. denied, 537 U.S. 974 (2002). If an analysis of the events being discussed is needed in the form of an opinion, then lay opinion testimony is admissible. Id. at 515-16. "A district court's decision to admit or exclude lay opinion testimony is reviewed for abuse of discretion." United States v. Peoples, 250 F.3d 630, 639 (8th Cir. 2001). Because Oslund did not object to the redirect testimony at trial, we review for plain error. United States v. Olano, 507 U.S. 725, 732-36 (1993). The statements in question were made on redirect in response to the defendant's cross-examination on the same subject which had also solicited Koehler's opinion, and were based on the witness's personal perceptions as a participant in the conversation. As such, we find no error in the district court allowing Koehler's testimony.

## D. Improper Remarks

Oslund next argues that the prosecution made improper remarks during closing arguments that attacked the integrity of defense counsel and were insulting. "'A failure to object to statements made during closing argument waives such an objection.'" Zutz v. Case Corp., 422 F.3d 764, 774 (8th Cir. 2005) (quoting Billingsley v. City of Omaha, 277 F.3d 990, 997 (8th Cir. 2002)). Oslund's counsel made no objection to the remarks at trial, and as such Oslund's claim now fails unless we find plain error. See id.; see also Olano, 507 U.S. at 732-36. After reviewing the record, while we find the statements troubling, we conclude that the statements in

question were not so "plainly unwarranted and clearly injurious" that reversal is required in order to avoid a "plain miscarriage of justice." Billingsley, 277 F.3d at 997 (internal marks omitted).[5]

### E. Sufficiency of the Evidence

Oslund challenges the sufficiency of the evidence supporting his convictions. "'We review de novo the question of whether the evidence is sufficient to support a conviction.'" United States v. Skinner, 433 F.3d 613, 615 (8th Cir. 2006) (quoting United States v. Vazquez-Garcia, 340 F.3d 632, 636 (8th Cir. 2003)). "Only if 'no interpretation of the evidence . . . would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt' will we reverse a jury's verdict on the grounds of insufficient evidence." Id. (quoting United States v. Morton, 412 F.3d 901, 904 (8th Cir. 2005)) (some internal marks omitted).

Oslund specifically attacks the reliability of the two eyewitnesses who identified him and testified at trial. The use of eyewitness identification testimony often raises issues concerning the reliability of the claimed identification. See United States v. Martin, 391 F.3d 949, 954 (8th Cir. 2004). However, this court has stated that "[t]he evaluation of eyewitness testimony is for the jury alone." United States v. Kime, 99 F.3d 870, 884 (8th Cir. 1996), cert. denied, 519 U.S. 1141; 520 U.S. 1220 (1997). If there are inconsistencies in a witness's testimony, problems with the

---

[5]The complained of statement occurred during the Government's rebuttal closing argument. Referring to statements made by defense counsel during his closing argument, government counsel made the statement, "He is misleading you, and he himself is throwing smoke" (Trial Tr. at 1322). The defense had alluded to the fact that Agent Walden had jumped to conclusions and ignored parts of the investigation because he was so focused on Oslund. In response, the Government countered the argument that investigators had rushed to judgment with a summary of the testimony in the case and about the investigation, concluding with the disputed statement.

identification, a prolonged length of time that would raise concerns, or other similar issues, the defense has the opportunity to raise those concerns at trial and bring them out on cross-examination. Id. The jury then can decide how much weight and credibility to give such identifications. At Oslund's trial, the jury was instructed by the district court on factors to consider when weighing eyewitness identification, and the defense had ample opportunity to raise and argue the issue of its reliability to the jury. It was then up to the jury to determine the weight to give to the identifications, and we will not second-guess their determination in this matter.

However, even if the eyewitness identification evidence were excluded, we would find that there was sufficient inculpatory evidence from which a jury could reasonably find Oslund guilty. The other evidence included the taped conversations between Oslund and Russell, taped conversations between Koehler and Oslund, testimony from several of Oslund's associates regarding confessional statements made by him, testimony that Oslund had more cash than usual around the time of the crime, and testimony that Oslund had been seen with a gun similar to that used in the crime around the time it occurred. In light of this and all the other evidence in the record, we conclude that Oslund's challenge to the sufficiency of the evidence is without merit.

**F. Sentencing**

Oslund was sentenced pre-<u>Booker</u>, but post-<u>Blakely</u>,[6] and at his sentencing hearing he objected to the court's use of the Sentencing Guidelines as unconstitutional. The court disagreed, holding that it was required to apply the Guidelines as mandatory. Shortly after sentencing, <u>Booker</u> was decided, holding that the Guidelines can only be applied in an advisory role. 543 U.S. at 245-46. Oslund "correctly preserved his <u>Booker</u> issue at sentencing, and we therefore review for

---

[6]<u>Blakely v. Washington</u>, 542 U.S. 296 (2004).

harmless error, with the government bearing the burden of proof." United States v. Olthoff, 437 F.3d 729, 732 (8th Cir. 2006) (citing United States v. Mendoza-Mesa, 421 F.3d 671, 672-73 (8th Cir. 2005)).

On appeal, Oslund argues that because the Guidelines are no longer mandatory, he should have the opportunity to be resentenced by the district court. He contends that because the court could have imposed a non-Guidelines sentence, it should now be given an opportunity to do so in light of Booker. Because no Guidelines sentencing enhancements were imposed (apart from those involving Oslund's prior convictions), there was no constitutional Booker error, and the burden is thus on the government to prove that the non-Constitutional error in applying the Guidelines as mandatory rather than advisory did not substantially influence the outcome of the proceedings and was, consequently, harmless. Mendoza-Mesa, 421 F.3d at 673.

Oslund was sentenced to the statutory maximum of 20 years on Count 1 (robbery), to life imprisonment on Count 2 (murder during a robbery), and to life imprisonment on Count 3 (felon in possession of a firearm). Counts 1 and 3 were to be served concurrently, with Count 2 to be served consecutively. The Guidelines range on Count 3 was life imprisonment, which the district court imposed due to the then mandatory application of the Guidelines. United States Sentencing Guidelines Manual (USSG) § 2A1.1 (Nov. 1998). However, as to Count 2 (murder during a robbery), the statutory range was ten years to life imprisonment. 18 U.S.C. §§ 924(c)(1)(A)(iii); 924(j)(1) (1998).[7] Section 5G1.2(a) of the 1998 Guidelines provided that for § 924(c) offenses, the statutory range became the Guidelines range.

_____

[7]In order to avoid a potential ex post facto problem, the district court used the Sentencing Guidelines in effect on November 22, 1998, the date the crime occurred, rather than those in effect at the time of the sentencing. Likewise, we note that 18 U.S.C. § 924(c) was amended on November 13, 1998, nine days before this crime was committed. The amendments created a new mandatory penalty under § 924(c) of a minimum of ten years of imprisonment when a firearm is discharged.

Paragraph 81 of the Presentence Investigation Report told the district court that the Guidelines range on Count 2 was five years to life, not recognizing that the recent amendments had increased the mandatory minimum from five years to ten years when a firearm is discharged. The district court therefore had the ability on Count 2, even under the mandatory Guidelines regime, to sentence Oslund anywhere within that range of ten years to life but declined to exercise that discretion in Oslund's favor. Instead, the court imposed the longest sentence available to it. "The fact that a district court chose not to exercise its discretion to impose a lesser sentence is evidence that the same sentence would have been imposed under an advisory guidelines regime." United States v. White, 439 F.3d 433, 435 (8th Cir. 2006); see also United States v. Davis, 442 F.3d 681, 684 (the defendant could not show a likelihood that he would have received a lesser sentence under an advisory Guidelines regime because the district court did not use the discretion available to it in his favor when sentencing under a mandatory Guidelines regime, and a "sentence at the top of the Guidelines range completely dissipates any residual doubt . . . about whether [the defendant] would have received a more lenient sentence" had the Guidelines been treated as advisory); United States v. Perez-Ramirez, 415 F.3d 876, 878 (8th Cir. 2005) (holding that because the district court did not fully use its discretion to depart from the Guidelines when determining the proper range or in imposing the term of sentence (sentence was 2 months above sentencing-range minimum), any Booker error was harmless).

The court made specific statements at sentencing that also support the conclusion that any Booker error committed by application of the Guidelines as mandatory is harmless, and we are left with little doubt that the court would have imposed the same sentence on Counts 1 and 3 had the Guidelines been treated as advisory. During the sentencing hearing, the court stated "[s]hould you ever be released, and it would be contrary to my recommendation that they do so, it is ordered by statute that you serve a term of supervised release." (Sent. Tr. at 32.) When discussing restitution payments, the court made the statement that it was optimistic

that Oslund would not be released. The court then added that "what you did ought not to be repeated, and I'm placing you in a position where you may not do so." (Sent. Tr. at 34-35.) After reviewing the sentence pursuant to 18 U.S.C. § 3553(a), we also find that it is not unreasonable. The court made reference to § 3553(a) when discussing the reasons for imposing the sentence and stated that the sentence would satisfy those factors, leading us to believe the district court recognized and considered them when imposing the sentence. See United States v. Dieken, 432 F.3d 906, 909 (8th Cir. 2006) (district court not required "to categorically rehearse each of the section 3553(a) factors on the record . . . as long as it is clear that they were considered). Based on the record before us, we conclude that the court would have imposed the same sentence on each count had the Guidelines been viewed by the Court as advisory, and we further find that the sentence imposed on each count is reasonable when measured by the factors in § 3553(a).

## G. Restitution

Oslund was ordered to pay $278,745 in restitution to Brinks. This amount included the $59,750 that was stolen in the robbery; $8,380.86 for medical and counseling expenses for Strelow and his family; $7,500 expended on funeral expenses; $100,369.50 in lost income already paid by Brinks to Strelow's family; and $102,744.65 committed by Brinks for future lost income that will be paid to the victim's estate. Oslund objected to the restitution order on two grounds: (1) restitution was a question for the jury under Blakely/Booker, and (2) the inclusion of future earnings is not authorized by statute.

Oslund's first challenge fails. We have held that neither Blakely nor Booker affects the determination of restitution or the burden in establishing a proper amount. See United States v. May, 413 F.3d 841, 849 (8th Cir.) (finding "persuasive" the view of other circuits that have determined that Apprendi, Blakely, and Booker do not affect the determination of restitution amounts), cert. denied, 126 S. Ct. 672 (2005);

-19-

see also United States v. Miller, 419 F.3d 791, 792-93 (8th Cir. 2005), cert. denied, 126 S. Ct. 1379 (2006).

The second objection, to the inclusion of future lost income in a restitution order, raises an issue of first impression for this court. The district court's fact-finding as to the amount of restitution under the Mandatory Victim Restitution Act (MVRA) is reviewed for clear error. Miller, 419 F.3d at 792. The burden is on the government to prove the amount of restitution owed based on a preponderance of the evidence, id., and "the court has wide discretion in ordering restitution," United States v. Reichow, 416 F.3d 802, 804-05 (8th Cir.), cert. denied, 126 S. Ct. 784 (2005).

Restitution in this case was mandatory under the MVRA. 18 U.S.C. § 3663A. "We review . . . the district court's application of the restitution statute de novo." Reichow, 416 F.3d at 804. When the MVRA was enacted in 1996, it expanded upon the permissive restitution statute that was already in place—18 U.S.C. § 3663—and made it mandatory to order restitution in certain cases, particularly crimes of violence and theft crimes with identifiable victims who "suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1). When an offense causes bodily harm to a victim, restitution must be ordered for medical or psychological treatment, costs of therapy and rehabilitation, and "income lost by such victim as a result of such offense." 18 U.S.C. § 3663A(b)(2). If the victim dies, funeral and related expenses are also included. 18 U.S.C. § 3663A(b)(3). When the crime causes the death of a victim, the representative of that victim's estate or a family member may assume the victim's rights. 18 U.S.C. § 3663A(a)(2).

Because this is an issue of first impression, we must determine if the MVRA authorizes an award of future lost income. "When determining the meaning of a statute, our starting point must be the plain language of the statute," and our goal "is to give effect to the intent of Congress." Watson v. Ray, 192 F.3d 1153, 1155-56 (8th Cir. 1999) (internal marks omitted). If the statute itself does not define a word, then

the common sense meaning of the word is used and considered binding, absent congressional intent to the contrary. Id. at 1156. The MVRA does not define "income" or distinguish between past or future income. However, the statute plainly states that a victim can recover income that is lost due to a crime causing bodily injury, and if that victim dies, then the estate can recover in the victim's place. Because future income is income that is lost to the victim as a direct result of the crime, the plain language of the statute leads to the conclusion that lost future income can be included in a restitution order.

However, that does not mean that it is always proper for lost future income to be awarded in a restitution order. The MVRA also states that restitution does not need to be awarded if the district court finds that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution . . . is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). If the amount of future income is contested by a defendant and the district court finds that determining the proper amount would be unduly burdensome and time-consuming, the court has the discretion to decline to award future income in the restitution order. Not every case will be overly burdensome though, such as cases where the amount is not in dispute or where it is easily determined. In those situations, the MVRA does not prevent the district court from using its abundant discretion in crafting restitution orders to include the lost future income of a victim.

While Oslund relies heavily on United States v. Fountain, 768 F.2d 790, 802 (7th Cir. 1985), cert. denied, 475 U.S. 1124 (1986), to support his position that future wages are not to be included in restitution orders, his reliance is somewhat misplaced. Fountain involved a restitution order under the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, which since its amendment in 1996 is very similar to the MVRA (with the exception that the MVRA is mandatory and the VWPA is discretionary). Our holding today parallels to a large extent the reasoning of the

Seventh Circuit, which held in <u>Fountain</u> that restitution orders that require a court to calculate lost future earnings are unduly burdensome and complicated and as such are not authorized by the VWPA, unless the amount in question requires no calculation, such as when it is uncontested.  <u>Fountain</u>, 768 F.2d at 802.  We agree with the Seventh Circuit that a burdensome, complicated, or speculative calculation provides a good reason for the district court to decline to exercise its discretion in favor of including future lost income in a restitution order.  However, an award of lost future income is not precluded by the MVRA, subject to the burden on the sentencing court.

Oslund does not challenge the amount of the future income awarded by the district court, only its award in general.  As such, the actual amount was uncontested and there was no need for the district court to do any sort of calculation.  We also believe the employer would not have agreed to pay an amount that was not justified by the circumstances of its employment relationship with the victim.  Because there was not an undue burden cast upon the court in this case, it was not improper for lost future income to be included in the restitution order.

III.

Accordingly, we affirm the judgment of the district court.
_____